932 A.2d 757

**Patrick Winfred ASHLEY**

v.

**Michelle Marie MATTINGLY.**

**No. 2169, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Sept. 13, 2007.

---

Nicholas D. Capousis, on brief, Annapolis, for appellant.

William R. Lenck, on brief, Baltimore, for appellee.

Panel HOLLANDER, SALMON, SHARER, JJ.

HOLLANDER, J.

In this appeal, we must determine whether the Circuit Court for Wicomico County erred when, many years after the parties' divorce, it refused to permit a challenge to paternity with respect to a child born during the parties' brief marriage. Patrick Winfred Ashley, appellant, and Michelle Marie Mattingly, appellee, were married on April 18, 1990. Some eight months later, on December 11, 1990, Chase Patrick Ashley was born. Shortly thereafter, on January 18, 1991, the parties separated. The Circuit Court for Wicomico County issued a

Judgment of Absolute Divorce on August 20, 1992, by which appellee was awarded sole custody of Chase, appellant was awarded visitation, and he was ordered to pay child support.

More than a decade later, in 2004, appellant began to doubt his paternity of Chase. He obtained DNA testing, which established that he is not Chase's biological father. Consequently, in December of 2004, appellant filed a "Complaint for Discontinuance of Child Support and Request for Paternity Testing."[1] Among other things, appellant sought a judicial declaration that he is not Chase's biological father, and asked the court to terminate his child support obligation. After the circuit court granted appellee's motion to dismiss, this appeal followed.

Appellant poses the following questions:

1. Did the trial judge commit error in dismissing appellant's amended complaint to set aside and partially vacate the judgment of absolute divorce?

2. Did the trial judge commit error in dismissing Steven Mark Reid as a party defendant?

For the reasons that follow, we shall vacate and remand.

### FACTUAL AND PROCEDURAL SUMMARY[2]

Prior to the parties' marriage, appellee dated Steven Mark Reid. When that relationship ended, appellant and appellee

---

1. Appellant's complaint was filed under the same case number as the parties' earlier divorce proceedings.

2. On October 2, 2006, appellant filed a motion to supplement the record with two affidavits, claiming that the information contained therein had been discovered "very recently." The affidavit of Kelly Pullen, a former business partner of Reid, indicates that Reid had previously expressed his belief to Pullen that he is Chase's biological father. The affidavit of Nancy D. Ashley, appellant's mother, sets forth a conversation in which Reid allegedly expressed his belief to appellee that he may be the biological father of Chase. Appellee opposes the motion, claiming it would be "patently unfair" to supplement the record with these affidavits. Because this evidence was not a part of the record below, and thus was not considered by the circuit court, we shall deny the motion. In any event, because the court below granted

renewed their previous relationship. As a condition of his marriage to appellee, appellant asked appellee to take a pregnancy test. According to appellant, appellee subsequently "represented to Mr. Ashley that the results of the test indicated that she was not pregnant." Thereafter, the parties were married on April 18, 1990.[3] Chase was born some eight months later, on December 11, 1990. The following month, when Chase was just a month old, the parties separated.

Appellant filed a "Complaint for Absolute Divorce" on April 29, 1992, in which he alleged, *inter alia,* that the parties "had a child by the name of Chase Patrick Ashley...." He requested "reasonable visitation...." In her answer, appellee asserted: "That as a result of the marriage, [the parties] had a child by the name of Chase Patrick Ashley, born December 11, 1990." In her "Counter–Complaint," filed on July 15, 1992, appellee averred: "That one child was born to the parties as a result of their marriage; to wit, Chase Patrick Ashley, d.o.b. 12/11/90."

The court (Truitt, J.) held a divorce hearing on August 11, 1992.[4] Appellant testified that one child, Chase, was "born as a result of the marriage." By "Judgment of Absolute Divorce" dated August 20, 1992, the trial court awarded sole custody of Chase, "the minor child of the parties," to appellee, and granted reasonable visitation to appellant. The court also ordered appellant to pay $100 per week in child support. At some point after the parties' divorce, appellee and Chase

---

appellee's motion to dismiss, we construe the facts in the light most favorable to appellant. *Lloyd v. General Motors Corp.,* 397 Md. 108, 121–22, 916 A.2d 257 (2007).

**3.** Appellant states in his brief that the parties were married on May 18, 1990, while appellee's brief indicates that they were married on April 18, 1990. Appellant's testimony at the divorce proceedings was consistent with appellee's brief. The discrepancy is not material to the issues on appeal.

**4.** A transcript of the hearing is included in the record before us. Appellant and his father, Ira Winfred Ashley, were the only witnesses.

relocated to Virginia, and appellant only had "sporadic" visitation with Chase.

In the spring of 2004, appellant "came in visual contact" with Reid and, "based on his observation, did not believe he (Mr. Ashley) was the biological father" of Chase. Appellant and Chase underwent independent DNA testing in April of 2004. The results, attached to appellant's complaint, revealed that there was a 0.0% probability that appellant is Chase's biological father.

As a result of what transpired, on December 1, 2004, appellant filed a "Complaint for Discontinuance of Child Support and Request for Paternity Testing." In addition to the facts previously set forth, appellant claimed that appellee led appellant to believe that Chase was born to the parties. He averred:

[Appellant] is now informed and believes and on that basis alleges that Defendant Mother and former spouse was pregnant with the minor child prior to their marriage and, Defendant Mother represented to Plaintiff that she was not pregnant prior to the marriage and further, upon the representation, Plaintiff and Defendant were married.

Further, appellant alleged that in September 2004 he told Ms. Mattingly about the results of the DNA testing and expressed his belief, based on Ms. Mattingly's prior relationship with Mr. Reid, that Mr. Reid is Chase's biological father. According to appellant, Ms. Mattingly asked, "should we tell [Chase] or not," and also asked Mr. Ashley if he thought Chase would hate her when he found out. Appellant asked the court, *inter alia*, to order paternity testing; declare that appellant is not the natural father of the minor child; and relieve appellant from his obligation to pay child support.

Appellee filed a motion to dismiss on March 18, 2005, claiming the complaint failed to state a cause of action upon which relief could be granted. On May 4, 2005, appellant filed "Plaintiff's Motion to Add Party Defendant," seeking to add Reid as a defendant. On May 9, 2005, after a hearing, the

court (Beckstead, J.) granted appellee's motion to dismiss, with ten days leave to amend.

Accordingly, on May 16, 2005, appellant filed an "Amended Complaint to Set Aside and Partially Vacate the Judgment of Absolute Divorce and Request for Paternity Testing." In his amended suit, appellant alleged, in part:

11. That [appellee] knew and fraudulently did not inform [appellant] that she was in fact pregnant prior to the marriage, knowing she was in fact pregnant and fraudulently misrepresented to [appellant] that she was not pregnant at the time of her marriage to [appellant], and that he was not the minor child's biological child when the minor child was born.

12. That [appellant] only assumed that he was the father of the minor child who was born after the marriage of the [appellant] and [appellee], and did not know at the time that he was not the minor child's biological father.

13. That there has been no previous declaration of paternity attributed to [appellant].

14. That [appellant] has been informed by the minor child that [appellee] has informed the minor child of the nature of the pending proceeding.

Among his requests for relief, appellant asked the court to require the parties and Chase to undergo blood tests in accordance with § 5–1029 of the Family Law Article of the Maryland Code and, upon receipt of the test results, to

exercise its revisory power in accordance with Rule 2–535(b) of the Maryland Rules of Court and pass an Order setting aside and vacating, in part, the Judgment of Absolute Divorce, rebutting the presumption that [appellant] is the biological father of a child born during the parties' marriage and obligation for payment of child support.

Appellee again moved to dismiss, and also opposed appellant's motion to add Reid as a defendant. The court (Jackson, J.) filed an Order on May 25, 2005, adding Reid as a party defendant. Thereafter, on June 8, 2005, appellee filed a "Motion to Strike Order Adding Party Defendant."

**44**

Following a motions hearing on August 19, 2005, the circuit court (Davis, J.) orally granted appellee's motion to dismiss the amended complaint, as well as the motion to strike the order adding Reid as a party defendant. In particular, the court determined that the "paternity provision" of the Family Law Article applies to "children born out of wedlock," and Chase was not born out of wedlock. Therefore, the court concluded that the statute was not applicable.

The court stated:

Well, we are here on, I guess, an Amended Complaint by Mr. Ashley to set aside and partially vacate the provisions of a divorce decree that was entered in 1992, and in conjunction with that to request paternity testing.

And the basis in that divorce degree [sic] that was entered contained various provisions regarding Chase Patrick Ashley who was then, I guess, I don't know exactly how old, a year or two, I guess, and it provided among other things that it was a judge [sic] ordered by consent of the parties that sole custody of the minor child of the parties be awarded to Michelle Ashley, that Patrick Ashley be awarded reasonable visitation and then provided for payment of child support.

After discussing the allegations in the suit, the court said:

[O]rally, this morning [appellant's counsel] also added that the Plaintiff's position is that during the course of the 1992 divorce that the defendant had an obligation to disclose to the plaintiff and to the Court that the plaintiff was not the father of the child, biological father of the child, and that failure to disclose, and assuming for purposes of this, that for this motion and ruling that, in fact, Mrs. Mattingly didn't have a pregnancy test or did not have a pregnancy test that disclosed that she was not pregnant and misrepresented those facts to the plaintiff, that and the failure to correct that mistaken—or that the erroneous representation form the basis for the plaintiff[']s allegation that fraud was com-

mitted by the defendant during the course of the divorce and that the Divorce Order is a result of that fraud. The court continued:

Now, rule 2–535 provides basically that the Court can exert advisory [sic] power and control over any Judgment within 30 days after the entry of the Judgment except that on the motion of any party at any time, the Court may exercise [its] advisory [sic] power and control over the Judgment in case of fraud, mistake or irregularity.

Now, fraud in this context does not necessarily have—it does not have as broad a meaning as would be applicable in some other context. And the issue here with respect to fraud is whether assuming that Mrs. Mattingly was untruthful with those representations, and she intended to deceive and to have Mr. Ashley rely on those representations, and assuming further that that [sic] was fraudulent, that does not necessarily constitute fraud within the meaning of this particular rule because the Maryland Appellate Courts have established that the fraud which is necessary in order to seek relief, it must prove extrinsic fraud and not intrinsic.

It is defined in, I guess, most recently looking at the annotations Manigan (phonetic) versus Burson (phonetic) a 2004 Court of Special Appeals case that says fraud is extrinsic when it actually prevents an adversarial trial but it is intrinsic when it is employed during the course of the hearing which provides a forum for the truth to appear.

Basically I think the authorities cited by [appellee's counsel] are correct in that this "fraud", I am using the term quotes, assuming that the allegations in the light most favorable to the plaintiff are correct, and that it would constitute fraud are not fraud of the nature that prevents an adversarial trial in the cases which involved actual perjured testimony, an Order based on perjured testimony, not forming the basis for subsequent relief on the grounds of fraud. Certainly, this does not rise to that level.

And if it wasn't an appropriate basis then, it certainly wouldn't be in this case. So if we approach it on what

would be the traditional and generally only basis to look at this which is attempting to revise a Judgment more than 30 days after the Order is entered, or a Judgment is entered, the Plaintiff's motion has to fail.

I will just comment with respect to, I asked a question of [appellant's counsel], but both counsel responded to this. The specific issue was not litigated. There was no contest as to paternity, and does that make a difference? I guess, in my view it doesn't. I think that the general rule is that any issue which was raised or could have been raised with respect to a particular matter, the doctrine of res judicata generally precludes that issue from being raised subsequently in another proceeding, and certainly in a divorce proceeding that involves issues of child custody, child support, child visitation, the paternity of that child certainly would be a germane subject that would be a subject that could have been raised and wasn't.

It was resolved based on the review of the actual Order on the basis of, I think, a consent or stipulation of the parties, but I don't think that the fact that it was not a knock down drag out fight on that issue that resulted in a specific finding of fact by the Court, I don't think that changes the result, and the only thing that would is whether or not the legislation and the more recent cases such as the cases that counsel had referred to in the paternity case issue makes a difference. And I guess my conclusion with that is this.

The provisions which plaintiff is relying upon are those in the subtitle 10, title 5 of the Family Law Article, that being paternity proceedings, and it is correct that the statement of legislature [sic] policy, the court decisions and the other provisions of that statute make clear to me that it does not relate to a child born in wedlock.

\* \* \*

In our case, there is a divorce decree which actually makes findings and enters Orders to the effect that there is a child. And so I don't think that affects or disturbs in any

way the analysis that as a result of any conclusion I have stated so far as Rule 2–535 is concerned.

And I guess, really, I think this Court today is in much the same position that the Court of Appeals, I guess, it was in the, I guess maybe it was the Tandra S. versus Tyrone W. case where the Court of Appeals said, and I think if I am not confusing which facts go with which case, there was a case that was presented in which the evidence was that the person who was paying child support was definitely not the father. But it hadn't—the issue had not been raised on an appropriate basis from a timing stand point, and the Court said while it's obviously harsh under the state of the law as it exists, that is the decision the Court has to make as a result of which the legislature went to work and enacted legislation that would permit the paternity issue to be raised which it subsequently was, and I guess was resolved favorably to the father.

The court concluded:

As I see the law in this particular case, I think we are, unfortunately for Mr. Ashley, in the same situation. Based on what is proffered it seems clear that he is not the biological father, however, that determination was made in, I guess, 2004 and to gain relief it requires setting aside provisions in the 1992 Divorce Order, and I don't believe that the state of the law is such that discovering this fact in 2004 provides the necessary factual basis to grant relief under Rule 2–535 to modify an Order that was entered into [in] 1992.

The legislature can change that, but I don't think that the Court can. So for that reason, I am going to grant the Motion to Dismiss and while doing so, I guess, probably makes moot the motion to—may make moot the Motion to Strike the Order adding Mr. Reed [sic] as a party defendant. So we will tie everything up in a neat bundle, I am going to grant that motion as well.

A judgment was docketed on September 21, 2005, dismissing the suit without leave to amend.[5] On the same day, appellant noted an appeal. Thereafter, on September 30, 2005, appellant filed "Plaintiff's Motion to Alter or Amend Judgment and Request for Hearing," which appellee opposed. That motion was denied on October 7, 2005.[6]

## DISCUSSION

### A.

According to appellant, under Maryland Code (1999, 2006 Repl. Vol.), § 5–1006 of the Family Law Article ("F.L."), a challenge to paternity may be brought at any time before a child's eighteenth birthday. Moreover, in his view, F.L. § 5–1038(a)(2)(i)2 "permits a *paternity judgment* to be set aside at any time," if scientific testing "establishes that the named father is not the biological father of the child." (Emphasis added.)[7] Relying on Maryland Rule 2–535(b), appellant also argues that the circuit court retained revisory power over the matter because appellee's conduct constituted "extrinsic fraud."

Appellant recognizes that, "[h]istorically, enrolled judgments could not be reopened for fraud unless there had been no adjudication on the merits." *See Gray v. Gray,* 245 Md. 713, 715, 228 A.2d 441 (1967); *Pinkston v. Swift,* 231 Md. 346, 351, 190 A.2d 533 (1963). In his view, however, the issue of parentage was not resolved "on the merits," because appellee consented to the Judgment.[8] He explains:

---

**5.** The docket entry states: "Defendant's motion to dismiss amended complaint: granted. Defendant's motion to strike order adding party defendant: granted."

**6.** Rule 8–202(c) states that if "a party files a timely motion pursuant to Rule 2–532, 2–533, or 2–534, the notice of appeal shall be treated as filed on the same day as, but after, the entry of a notice withdrawing the motion or an order disposing of it."

**7.** There is no "paternity judgment" in this case.

**8.** Appellant also suggests that for this reason "traditional preclusion doctrines of res judicata and collateral estoppel" do not apply to the paternity finding embodied in the divorce decree.

Appellant's parentage in this case was not determined by a declaration of paternity by the court, but by the fact the minor child involved was born during the brief marriage of Appellant and Appellee. This factual profile has been a troublesome issue because it involves the preclusive effect of paternity findings in divorce decrees, which are typically findings of nothing more than recitals found in the pleadings that a child or children were born of a marriage, custody was awarded and child support ordered. In this scenario, the child's paternity is not actually litigated.

Appellee counters that the trial court "correctly declined to exercise revisory power over the judgment of divorce" under Rule 2–535(b), because the conduct alleged by appellant does not constitute "extrinsic fraud." She asserts:

Appellant had every opportunity to avail himself of all his legal remedies at the time of the divorce proceeding which he initiated. The Appellee never fraudulently restricted his access to the court or prevented him from getting to court in the first place. . . . The Appellant did not act with ordinary diligence and does not have a meritorious defense to the underlying judgment.

According to appellee, F.L. §§ 5–1001 to 5–1048 apply only to "putative fathers of children born out of wedlock," and give them "expanded rights in paternity actions." She maintains, however, that appellant "cannot be a putative father because Mr. Ashley is already Chase's legitimate father." Appellee states:

The Appellant claims that the expanded rights afforded to putative fathers as the result of the 1995 amendments to the Paternity Act should extend to him as well. Actually, the Paternity [A]ct amendment favors the Appellee, not the Appellant. Presumably, the legislature amended the Paternity Act to avoid sometimes harsh results against putative fathers in cases involving children born out of wedlock. However, the legislature did not similarly amend the Estates and Trust Article to afford such rights to legitimate fathers of children born during wedlock. Nor did the

legislature amend the Paternity Act to apply to children born during wedlock. The legislature certainly could have amended either provision but chose not to in 1995 and has chosen not to in the intervening eleven years.

Further, appellee relies on Md.Code (2001, 2006 Supp.), § 1–206(a) of the Estates and Trusts Article ("E.T."), which provides:

A child born or conceived during a marriage is presumed to be the legitimate child of both spouses. Except as provided in § 1–207, a child born at any time after his parents have participated in a marriage ceremony with each other, even if the marriage is invalid, is presumed to be the legitimate child of both parents.

Based on E.T. § 1–206(a), appellee argues that, "[e]ven if this Court were to find that extrinsic fraud existed and the Appellant acted with ordinary diligence, the trial court correctly dismissed his claim...." She insists that appellant "would not be entitled to relief in this case," because Chase "was born during the marriage while the parties were living as husband and wife."

Appellee concludes:

If the Appellant's request is granted, paternity testing would become almost mandatory in every divorce case involving minor children. Husbands would seek to disown their children (as is the case here). Wives would seek to strip husbands of their custodial and visitation rights. It could even be considered malpractice if an attorney failed to insist on paternity testing in every case. For these reasons and the reasons set forth in *Evans [v. Wilson*, 382 Md. 614, 856 A.2d 679 (2004),] the judgment of the lower court must be affirmed.

### B.

Under the Maryland Code, paternity may be established pursuant to the Family Law Article *or* the Estates and Trusts Article. *Turner v. Whisted*, 327 Md. 106, 112–13, 607 A.2d 935 (1992); *Toft v. State of Nevada*, 108 Md.App. 206, 224, 671

A.2d 99 (1996). In particular, two provisions in the Maryland Code relate to paternity determinations. As to children born out of wedlock, the statutory provisions governing "Paternity Proceedings" are set forth in F.L. §§ 5–1001 to 5–1048 (hereinafter, the "Paternity Act"). With regard to children born during the marriage, E.T. § 1–206(a) provides: "A child born or conceived during a marriage is presumed to be the legitimate child of both spouses." This means that a husband is presumed to be the father of a child born to his wife during their marriage.

■ The Paternity Act is largely aimed at addressing putative fathers in regard to children born outside of marriage. *See Stubbs v. Colandrea,* 154 Md.App. 673, 688, 841 A.2d 361 (2004); *Williams v. Williams,* 18 Md.App. 353, 356, 306 A.2d 564 (1973) ("We think it is clear from the provisions of the Paternity Act ... that it was the legislative intent to make it the exclusive basis in this State for enforcing the obligation of a *putative father to support his illegitimate child.*") (emphasis added).[9] F.L. § 5–1002, which sets forth the purpose of the Paternity Act, makes clear that it applies only when a child is born outside of marriage:

§ 5–1002. **Legislative Policy.**

(a) *In general.*—The General Assembly finds that:

(1) this State has a duty to improve the deprived social and economic status of *children born out of wedlock;* and

(2) the policies and procedures in this subtitle are socially necessary and desirable.

(b) *Purpose.*—The purpose of this subtitle is:

(1) to promote the general welfare and best interests of children *born out of wedlock* by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

---

**9.** *Williams* was subsequently overruled on other grounds by *Powley v. Owens,* 49 Md.App. 349, 431 A.2d 749 (1981).

(2) to *impose on the mothers and fathers of children born out of wedlock* the basic obligations and responsibilities of parenthood; and

(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children *born out of wedlock.*

(c) *Establishment of paternity.*—Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child.

(Emphasis added.)

F.L. § 5–1027(c) is also relevant. It provides:

**§ 5–1027. Trial to be held after birth of child—Burden of proof; presumptions; testimony.**

\* \* \*

(c) *Presumption.*—(1) There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception.

(2) The presumption set forth in this subsection may be rebutted by the testimony of a person other than the mother or her husband.

(3) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, it is not necessary to establish nonaccess of the husband to rebut the presumption set forth in this subsection.

(4) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, both the mother and her husband are competent to testify as to the nonaccess of the husband at the time of conception....

Under F.L. § 5–1006(a), a proceeding to establish paternity may be initiated at any time prior to the child's eighteenth birthday. F.L. § 5–1029(b) provides that, upon motion of the Child Support Enforcement Administration or one of the parties to a paternity proceeding, "the court shall order the mother, child, and *alleged father* to submit to blood or genetic

tests to determine whether the *alleged father* can be excluded as being the father of the child." (Emphasis added.)

Notably, F.L. § 5–1038 outlines the circumstances under which a prior paternity judgment may be modified. It allows a court to set aside a paternity judgment based on scientific evidence that demonstrates that the adjudicated father is not the biological father. The statute states:

### § 5–1038. Finality; modification.

(a) *Declaration of paternity final; modification.*—(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

(2)(i) *A declaration of paternity may be modified or set aside:*

1. *in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or*

2. *if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.*

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

(Emphasis added.)

F.L. § 5–1038 was amended in response to the Court of Appeals's decision in *Tandra S., supra,* 336 Md. 303, 648 A.2d 439. In *Evans v. Wilson,* 382 Md. 614, 630, 856 A.2d 679 (2004), the Court of Appeals explained: "[T]he General Assembly amended Section 5–1038 of the Family Law Article, to provide an alternative way for an adjudged father to challenge

a judgment of paternity," i.e., in addition to a Rule 5–235 proceeding. At the time the Court decided *Tandra S.,* F.L. § 5–1038 provided:

### § 5–1038.  Finality; modification.

(a) *Declaration of paternity final.*—Except in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity, a declaration of paternity in an order is final.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

In *Tandra S.,* 336 Md. 303, 648 A.2d 439, the parties had a child out of wedlock. Tyrone accepted the representation of Tandra, the mother, that he was the child's father. He signed a written agreement acknowledging the same and agreed to pay child support. Tandra filed a paternity action in circuit court, and a judgment of paternity was entered against Tyrone. Two and one-half years later, Tyrone filed a motion to set aside the judgment of paternity and requested blood tests, claiming that Tandra had told him that he was not the child's father. The circuit court granted the request for a blood test, which established that Tyrone was not the father. Consequently, the court vacated the paternity declaration.

The Court of Appeals held that even though Tyrone had proven that he was not the child's biological father, he failed to show that the paternity judgment should be set aside because, pursuant to Md. Rule 2–535(b), a judgment of paternity could only be set aside upon a showing of fraud, mistake, irregularity, or clerical error. *Id.* at 319–20, 648 A.2d 439. As a consequence, Tyrone was still required to pay child support. Although the Court of Appeals recognized that the result was "harsh," it noted that Tyrone "was advised of all the safeguards the law provides to prevent incorrect decisions, and [he] waived all those rights." *Id.* at 324, 648 A.2d 439. In

reaching its decision, the Court was mindful of the unfairness that would "occur to the children if the paternity issue were allowed to be relitigated, thereby leaving the children father-less and without support." *Id.* at 325, 648 A.2d 439. More-over, it emphasized that the Court had "consistently said that a court's revisory powers do not provide for the amendment of an enrolled judgment on the ground of 'fundamental unfair-ness.' " *Id.* (citation omitted).

*Langston v. Riffe,* 359 Md. 396, 754 A.2d 389 (2000), was decided after F.L. § 5–1038 was amended. There, the Court recognized that, by amending F.L. § 5–1038,

> the Legislature intended for blood or genetic tests to be made available, upon a motion, to *any putative father* seeking to challenge a paternity declaration previously en-tered against him in which such blood or genetic test evidence was not introduced.... [A]n examination of the best interests of the child has no place in that determina-tion.

*Id.* at 428, 754 A.2d 389 (emphasis added).[10]

As we have seen, under F.L. § 5–1027(c), a man is pre-sumed to be the father of a child if the parties were married at the time of conception. Because Chase was born less than eight months after the parties' marriage, we cannot say that he was necessarily conceived during the marriage. E.T. § 1–206(a) is broader than F.L. § 5–1027(c); it provides that a man is presumed to be the father of the child if the child was conceived or born during the marriage. As Chase was born during the marriage, appellant clearly is presumed to be Chase's father under E.T. § 1–206(a). In our view, the Es-tates and Trusts Article applies here, and may provide relief from paternity.

Three cases—*Evans v. Wilson,* 382 Md. 614, 856 A.2d 679 (2004), *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992),

---

10. The *Langston* Court indicated, however, that even if paternity is invalidated, a court cannot order repayment of child support previously paid by the putative father. 359 Md. at 423, 754 A.2d 389.

and *Stubbs v. Colandrea,* 154 Md.App. 673, 841 A.2d 361 (2004)—present a situation converse to the one at bar, but are nonetheless instructive. In each case, a third party paramour claimed to be the father of a child born to a married couple, and sought genetic testing to *establish* paternity. The appellate courts were of the view that, in cases involving a child born during a couple's marriage, the Estates and Trust Article applies, rather than the Paternity Act.

We begin with a review of *Turner.* Mr. Turner had a sexual relationship with an unmarried woman who became pregnant. Before the child was born, however, the woman married another man and delivered the child during that marriage. Six months after the birth, the child's mother and her husband separated. While separated from his wife, the husband continued to visit the child on a regular basis and paid child support. After leaving her husband, the child's mother again started seeing Mr. Turner, who was then able to develop a relationship with the child. The renewed relationship between Turner and the child's mother lasted eighteen months. Turner's contact with the child then terminated.

Turner filed a complaint for visitation, and then moved for blood tests to establish his paternity. Following decisions in the circuit court and this Court denying Turner's requests, the Court of Appeals granted certiorari to consider the applicability of F.L. § 5–1029. It determined that, when the child at issue was born during a marriage, "an action to establish paternity is more appropriately brought under the Estates & Trusts Article." [11] *Turner,* 327 Md. at 113, 607 A.2d 935. The Court explained that, when a child is presumed "legitimate," and "where two men each acknowledge paternity of the same child," the procedure for considering the issue of paternity under the Estates and Trusts Article constitutes the " 'more

---

**11.** Previously, in *Taxiera v. Malkus,* 320 Md. 471, 478–79, 578 A.2d 761 (1990), the Court implicitly recognized that paternity could be established either by a statutory action under the Family Law Article or by way of an equitable action pursuant to the Estates and Trusts Article.

satisfactory' " and " 'less traumatic' " means of establishing paternity. *Id.* (citations omitted).

In reaching its conclusion, the Court compared a motion for a blood test under the Estates and Trusts Article with a request for a physical examination under Maryland Rule 2–423,[12] which the court has discretion to grant *for good cause. Id.* In the Court's view, the discretionary nature of the trial court's decision under the Estates and Trusts Article permits consideration of competing interests. For example, the court "must" consider the husband and wife's privacy interests, along with the alleged father's interest in a relationship with the child. *Id.* at 114, 607 A.2d 935. "Most significantly," said the Court, "the determination of good cause allows the court discretion to consider the best interests of the child." *Id.* at 116, 607 A.2d 935 (citing *Matter of Marriage of Ross,* 245 Kan. 591, 783 P.2d 331, 338 (1989) ("Prior to ordering a blood test to determine whether the presumed parent is the biological parent, the district court must consider the best interests of the child. . . ."); *McDaniels v. Carlson,* 108 Wash.2d 299, 738 P.2d 254, 261 (1987) (where child is presumed legitimate, best interests of the child should be considered before ordering blood tests)).

---

12. Md. Rule 2–423 provides:

**Rule 2–423. Mental or physical examination of persons.**

When the mental or physical condition or characteristic of a party or of a person in the custody or under the legal control of a party is in controversy, the court may order the party to submit to a mental or physical examination by a suitably licensed or certified examiner or to produce for examination the person in the custody or under the legal control of the party. The order may be entered only on motion for good cause shown and upon notice to the person to be examined and to all parties. It shall specify the time and place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made. The order may regulate the filing and distribution of a report of findings and conclusions and the testimony at trial by the examiner, the payment of expenses, and any other relevant matters.

The right to a mental or physical examination provided for under this Rule is a matter to be granted within the sound discretion of the court, "for good cause shown." *See Turner,* 327 Md. at 114, 607 A.2d 935; *Hutzell v. Boyer,* 252 Md. 227, 236, 249 A.2d 449 (1969); *Miles v. Stovall,* 132 Md.App. 71, 83, 750 A.2d 729 (2000).

The *Turner* Court continued, 327 Md. at 116–117, 607 A.2d 935 (citation omitted):

The criteria for determining the child's best interests in cases of disputed paternity include consideration of the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs. An important consideration is the child's past relationship with the putative father. Finally, other factors might even include the child's ability to ascertain genetic information for the purpose of medical treatment and genealogical history.

In *Evans, supra,* 382 Md. 614, 856 A.2d 679, Mr. Evans claimed to be the biological father of Kendi, a child conceived and born while her mother, Trina Wilson, was married to Askahie Harris. Almost a year after Kendi's birth, Evans filed a complaint for visitation, alleging that he was Kendi's father. In her answer, Wilson denied Evans's paternity of the child. Thereafter, Evans filed a complaint to determine paternity, requesting that the court order the parties to submit to blood or genetic testing to establish paternity. The circuit court denied Evans's request. It reasoned that Harris was presumed to be Kendi's father because she was born while her mother was married to him. To overcome that presumption, said the circuit court, Evans was required to demonstrate that a paternity test was in the child's best interests; he failed to do so.

Relying on *Turner*, the Court of Appeals reiterated that, when paternity is in question, the Estates and Trusts Article applies if the child was born during the marriage, "because it presents the 'more satisfactory' and 'less traumatic' means of establishing paternity." *Id.* at 628, 856 A.2d 679 (citations omitted). But, "the court must weigh the various interests of the parties and, in particular, consider whether blood or genetic testing would be in the best interests of [the child]." *Id.* at 629, 856 A.2d 679. The Court also said, *id.* at 636, 856 A.2d 679:

If the mandatory blood or genetic testing under Section 5–1029 could be invoked every time an individual seeks to establish paternity of a child born during a marriage, the consequences to intact families could be devastating. Without regard to the child's best interests, courts would be forced to order genetic tests of every child whose paternity is merely questioned. This would be the case even if the child is well cared for and could assert that he or she does not want his or her life to be disturbed. We do not believe that, in enacting the "Paternity Proceedings" of the Family Law Article, the legislature intended such an effect.

In *Stubbs, supra,* 154 Md.App. 673, 841 A.2d 361, Kevin Stubbs sought to establish paternity for a child born to Janice Colandrea while she was married to David Colandrea. The circuit court denied Stubbs's request for genetic testing, believing that the test was not in the best interests of the child. Speaking for this Court, Judge Rodowsky upheld the trial court's decision, concluding that the circuit court acted within its discretion in ruling that genetic tests were not in the best interests of the child. *Id.* at 688–89, 841 A.2d 361; 691. In evaluating the best interests of the child, we pointed out that the trial court

"should consider the extent of [the third party's] commitment to the responsibilities of parenthood, and balance his interest in establishing his status as [the child's] natural father against the [parents'] interest in protecting the integrity of the familial relationships already formed. This balance of interests should be considered in connection with the court's paramount concern of protecting [the child's] best interests."

*Id.* at 683, 841 A.2d 361 (citation omitted).

*Miles v. Stovall,* 132 Md.App. 71, 750 A.2d 729 (2000), is also instructive. *Miles* was a consolidated appeal, which arose from two cases: a civil paternity suit and a criminal non-support suit. Miles and Stovall were married on August 4, 1983, and were married when Stovall gave birth to a child, Brandon, in January 1984. The parties were divorced in May of 1999.

This Court extended the best interests of the child standard to a presumptive father who sought to challenge paternity.

The criminal non-support suit was instituted by the State on October 10, 1984. A warrant for Miles's arrest was issued on December 17, 1984, but was not served until March 26, 1999. In the meantime, Stovall filed a paternity case in January 1998, stating that she was not married when the child was conceived, that paternity had not been established by the court, and that Miles was the father. *Id.* at 75, 750 A.2d 729. Miles was eventually served with both the paternity warrant and the non-support warrant on March 26, 1999.

Shortly thereafter, on May 18, 1999, an absolute divorce was granted to Miles by the Superior Court of the District of Columbia, on the ground of separation without cohabitation for one year. Stovall did not appear. The District of Columbia divorce decree's findings of fact stated: "No children were born to the parties."

At a paternity hearing on May 25, 1999, Miles appeared *pro se.* "The court denied [Miles's] request for blood tests and dismissed the case without prejudice, based on the presumption that Miles [was] Brandon's father." *Id.* at 74, 750 A.2d 729. After a criminal non-support hearing on August 4, 1999, the court found Miles guilty of criminal non-support, and calculated child support from the date the warrant was issued on December 17, 1984.

On appeal, Miles argued that the circuit court erred in denying his request for a blood test to rebut the presumption of paternity.[13] The Court recognized that, under F.L. § 5–1027(c), Miles was not presumed to be the father because

---

**13.** In the Maryland circuit court proceedings, Miles also argued that the finding of fact by the D.C. Court—i.e., that no children were born to the parties—was binding on the Maryland courts through the Full Faith and Credit Clause of the United States Constitution. We disagreed, explaining that Maryland's "paramount interest in protecting the welfare and economic well-being of its minor residents" permitted us to decline to give full faith and credit to the foreign divorce decree's erroneous finding that there were no children born to the parties. *Id.* at 80, 750 A.2d 729.

Stovall conceded that she was unmarried at the time of the child's conception. *Id.* at 81, 750 A.2d 729. However, the Court reasoned that, under E.T. § 1–206, Miles was presumed to be the father, because the child was born during the marriage. *Id.* The Court said, *id.* at 81–82, 750 A.2d 729:

> Reading these two statutes in a way that advances the legislative policies involved[ ], and construing them as if they were not inconsistent with one another, as we must, *Taxiera v. Malkus,* 320 Md. 471, 480–81, 578 A.2d 761 (1990), we find that the lower court correctly presumed Miles to be Brandon's father, pursuant to the Estates and Trusts Article. However, that presumption is rebuttable. MD.CODE (1991), EST. & TRUSTS § 1–105. "A motion for blood tests made under the Estates & Trusts Article is best analyzed as a request for a physical examination under Maryland Rule 2–423,[ ] and the court has discretion to grant or deny the blood tests." *Turner,* 327 Md. at 113, 607 A.2d 935; *see also Monroe v. Monroe,* 329 Md. 758, 767, 621 A.2d 898 (1993).

We concluded that the circuit court erred, because it "erroneously applied an irrebuttable presumption of paternity.. . ." *Id.* at 74, 750 A.2d 729. The *Miles* Court explained, *id.* at 82–83, 750 A.2d 729:

> A review of the paternity proceedings transcript indicates that the lower court erroneously believed that, as a matter of law, blood tests could not be used to rebut a presumption of paternity in a paternity proceeding. Although the court stated the presumption was rebuttable, it actually imposed an irrebuttable presumption of paternity by ruling that rebuttal could not occur in "child support court." For instance, the court stated, "In this court, you are presumed to be the father of that child, which means you owe child support. You can file *in some other court* to try to [rebut the presumption]."[ ] Under Maryland Rule 2–423, the court should have exercised its discretion in evaluating whether Miles showed good cause to order blood tests, as well as considered the best interests of the child. *Monroe,* 329 Md. at 767, 621 A.2d 898; *Turner,* 327 Md. at 115–17, 607 A.2d

935;. *see also McDaniels v. Carlson,* 108 Wash.2d 299, 738 P.2d 254,. 261 (1987) (where child is presumed legitimate, best interests of the child should be considered before ordering blood tests)(cited with approval in *Turner,* 327 Md. at 116, 607 A.2d 935). Therefore, we find that the court erred in not exercising its discretion and in automatically setting child support based on an irrebuttable presumption. of paternity, and we reverse the lower court on this issue.

Finally, we look to *Monroe v. Monroe,* 329 Md. 758, 621 A.2d 898 (1993). There, the mother of a child sought to use blood test results during a custody dispute to show that Mr. Monroe was not the father. Although Mr. Monroe was not married to the mother at the time of the child's conception or birth, he was present at the time of the birth; his name was placed on the birth certificate as the child's father; the parties married a few years later; and Mr. Monroe treated the child as his own for all of the child's life. In analyzing the father's motion for blood tests, the Court of Appeals said: "It is appropriate for a court to consider the best interest of the child in assessing whether good cause has been. shown." *Id.* at 767, 621 A.2d 898. The Court continued, *id.:*

> If it would not be in the child's best interest to have the blood tests reveal that a man who has been the *de facto* father in the whole of the child's life is not the biological father, surely the circuit court should consider that probability in the exercise of its discretion under the good cause standard. That assessment may only be made by considering the entirety of the relationship between the child, the [mother] and [Mr. Monroe].

■ Based on the cases discussed above, we are satisfied that E.T. § 1–206 applies here, because Chase was born during the parties' marriage. Moreover, the court had discretion to order genetic testing to determine paternity if it first determined that it was in the child's best interest to do so. Because the court did not recognize that it had such discretion, it erred. *See Beverly v. State,* 349 Md. 106, 127, 707 A.2d 91 (1998) (finding reversible error, resulting in a remand for a new sentencing, where sentencing judge failed to recognize

"that she had discretion to sentence in accord with the plea agreement"). Therefore, we shall vacate the judgment and remand for further proceedings, at which the circuit court must consider whether it is in Chase's bests interests to order genetic testing.[14] In doing so, we express no opinion on the merits of whether it would be in Chase's best interest for the court to order genetic testing or any other relief in the event that the testing definitively establishes that appellant is not Chase's biological father.[15]

## APPELLANT'S MOTION TO SUPPLEMENT THE RECORD IS DENIED. JUDGMENT OF THE CIRCUIT

**14.** As best we can determine, appellant filed suit within three years of discovering that he is not Chase's father, and he allegedly acted with due diligence. In any event, neither limitations nor laches was raised below, and thus these issues are not before us. However, the length of delay may have a bearing on the "best interest" analysis.

**15.** Although we express no opinion on the merits, the decision of the Supreme Court of South Dakota in *Culhane v. Michels*, 615 N.W.2d 580 (S.D.2000), may provide guidance to the circuit court. In that case, the marriage of Margaret Culhane and Stephen Michels allegedly produced two daughters. When the children were six and four, the parties agreed to end their marriage and entered into a property settlement and child custody agreement that was later adopted by the circuit court. Eleven years later, Culhane sued Michels to recover delinquent child support. Michels moved for paternity testing to determine whether he was the biological father of the younger daughter. The circuit court denied his request, and the Supreme Court of South Dakota affirmed. It reasoned, *id.* at 589 (citations omitted):

Belated efforts to declare a child illegitimate, for whatever reasons, should seldom prevail. Michels has failed to show sufficient cause for paternity testing at this late juncture. The welfare of the child must be considered over the father's long delayed challenge to the child's parentage. Michels has treated both children as his own since birth. He claims that his request is not made to recover past child support, but merely to find out if he is the father and whether Culhane perpetrated fraud upon him.[ ] These are not compelling enough reasons to disrupt the life of a child born during their marriage. *See also Godin v. Godin*, 168 Vt. 514, 725 A.2d 904, 910 (1998)(noting that because "the State retains a strong and direct interest in ensuring children born of a marriage do not suffer financially or psychologically merely because of a parent's belated and self-serving concern of a child's biological origins," it would not reopen a paternity declaration in a divorce judgment "absent clear and convincing evidence that it serves the best interests of the child.").

COURT FOR WICOMICO COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID 75% BY APPELLEE, 25% BY APPELLANT.