949 A.2d 43

**DEPARTMENT OF HUMAN RESOURCES, GARRETT COUNTY DEPARTMENT OF SOCIAL SERVICES, BUREAU OF SUPPORT ENFORCEMENT, ex rel. Vicki Jo DUCKWORTH**

v.

**Darren Gerald KAMP.**

**No. 2871, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

May 30, 2008.

Joseph B. Spillman (Douglas F. Gansler, Attorney General, on the brief), Baltimore, for appellant.

G. Gary Hanna, Cumberland, for appellee.

Panel: HOLLANDER, DEBORAH S. EYLER, RAYMOND G. THIEME (Retired, specially assigned), JJ.

HOLLANDER, J.

In this appeal, we must determine, *inter alia*, whether the Circuit Court for Garrett County erred or abused its discretion in terminating the child support obligation of Darren Kamp, appellee, with respect to Julie Kamp, the fourth child born to Vicki Jo Duckworth during her marriage to appellee. The court's decision, embodied in an Order of January 19, 2007, was predicated on genetic testing that established that appellee is not Julie's biological father. Appellant, the Department of Human Resources, Garrett County Department of Social Services, Bureau of Support Enforcement, *ex rel.* Vicki Jo Duckworth ("DSS"), urges this Court to reverse the circuit court.[1]

At the time of the Kamps' divorce in 1999, appellee did not dispute Julie's paternity, and he was ordered to pay child support. On July 28, 2005, DSS filed a petition to increase

---

1. Ms. Duckworth participated in the proceedings below, but has not participated in the appeal. In the proceedings below, DSS's counsel told the trial court: "[I]t's a non-public assistance case" and "There's no state funds being paid out in this case[.]" No explanation has been provided with regard to DSS's involvement in the case.

appellee's child support obligation.[2] Appellee opposed the increase, claiming he is not Julie's biological father, and requesting genetic testing. The court-ordered testing excluded appellee as Julie's biological father. As a result, on May 25, 2006, appellee filed a "Motion to Terminate or Stay the Payment of Support," which the circuit court granted.

This appeal followed. Appellant poses four questions, which we quote:

1. Did the circuit court err in reopening and vacating provisions in final enrolled judgments, based on grounds that Mr. Kamp could have presented to the court in prior proceedings, where there was no finding by the court that the earlier judgments establishing Mr. Kamp as the father and requiring him to pay child support were entered due to fraud, mistake or irregularity?

2. If this Court decides that the circuit court had any discretion to consider Mr. Kamp's request to terminate child support, notwithstanding that the child was born during a marriage and her parentage w as established in prior enrolled judgments, did the circuit court properly conclude that Mr. Kamp was not stopped from denying paternity?

3. Did the circuit court violate Subtitle 2 of Title 10 of the Family Law Article when it terminated Mr. Kamp's child support obligation, thereby allowing him to pay less than the amount of child support presumed to be correct under the Maryland Child Support Guidelines, and in the absence of any record finding of grounds for departing from the guidelines?

4. Did the circuit court improperly extinguish child support arrears retroactively?

For the reasons that follow, we shall vacate the order of the circuit court and remand for further proceedings.

---

**2.** The parties do not explain why the motion to increase child support was filed by DSS, rather than Ms. Duckworth.

## FACTUAL AND PROCEDURAL SUMMARY

Appellee and Ms. Duckworth were married on September 13, 1983, and are the parents of three children whose paternity is not in dispute. Julie, the fourth child, was born on December 10, 1992, while appellee and Ms. Duckworth were still married. Nevertheless, appellee knew he might not be Julie's biological father.

Years later, on February 22, 1999, appellee filed a Complaint for Absolute Divorce, claiming that Ms. Duckworth had committed adultery. Notably, appellee averred that four children were born as a result of the marriage, "namely AMANDA KAMP, DARRIC KAMP, CASEY KAMP, AND JULIE KAMP." Further, he alleged that "it would be in the best interests of the minor children to be in the joint custody, and control of the parties." Appellee never challenged Julie's paternity in the Complaint.

In her answer to the suit, Ms. Duckworth admitted the allegations. Thereafter, Ms. Duckworth and appellee reached a voluntary separation agreement which provided, *inter alia,* for appellee "to pay [monthly] child support to [Ms. Duckworth] in the amount of $200.00 per child[.]" [3] The court incorporated, but did not merge, the agreement into its judgment of absolute divorce (the "Judgment"), entered April 9, 1999. The Judgment stated:

> **IT IS FURTHER ORDERED** that the parties shall have the joint care and custody of the minor children of the parties; namely **AMANDA KAMP** (Date of Birth: April 6, 1983), **DARRIC KAMP** (Date of Birth: August 13, 1984), **CASEY KAMP** (Date of Birth: February 12, 1988); and **JULIE KAMP** (Date of Birth: December 10, 1992); and
>
> **IT IS FURTHER ORDERED** that primary physical custody of the minor children shall be placed with [Ms. Duckworth] subject to the right of [appellee] to have reasonable

---

**3.** Appellee and Ms. Duckworth also agreed to reduce the child support "in any given month depending upon which parent a particular child has resided with for the majority of that month."

visitation with the minor children at such reasonable times and places as may be mutually convenient to the parties. **IT IS FURTHER ORDERED** that the physical custody shall be shared as provided in the parties' Agreement.

On January 11, 2002, Ms. Duckworth filed a "Petition to Establish Fixed Visitation and Child Support," alleging that appellee "has failed and refused to develop a fixed schedule for visitation" and that appellee's new wife "has acted in a manner to interfere in matters involving the children." She asked the court to:

a. Pass an Order establishing a fixed visitation schedule;

b. Pass an Order establishing child support;

c. Pass an Order for Earnings Withholding Order; and

d. Grant such other and further relief as the nature of her cause might require.

Appellee responded on February 27, 2002, by filing an answer and a "Counter Petition to Establish Custody, Visitation and Child Support."

Appellee and Ms. Duckworth entered into a Memorandum of Understanding ("MOU") on February 3, 2003, which the court incorporated, but did not merge, into an Order entered on March 14, 2003. The MOU set forth a custody and visitation arrangement for Casey and Julie, the remaining minor children. Further, appellee was ordered to pay $100 per month in child support. The court closed the case on May 19, 2003.

DSS triggered the reopening of the case on July 28, 2005, by filing a Motion for Modification of Child Support. Claiming that Julie resided with Ms. Duckworth full-time, while Casey resided with her half of the time, DSS asked the court to increase appellee's child support obligation, based on the parties' current incomes, "because $100.00 monthly is insufficient to meet [appellee's] share of the support and maintenance" of Casey and Julie. In addition, DSS asked that appellee's future child support payments be made through DSS.

Appellee filed a verified "Answer to Motion for Modification, Request for Child Support, and Request for Paternity Determination" on September 16, 2005. More than six years after the Judgment of Absolute Divorce was entered on April 9, 1999, appellee averred for the first time in a court submission that Julie is not his biological daughter. He also asserted that the issue of paternity "was recently raised by the said Vicki Jo (Kamp) Duckworth when she began to indicate to Julie Kamp and to others that [appellee] was not, in fact, the biological father of Julie Kamp." Accordingly, appellee asked the court to require Ms. Duckworth to pay child support for Casey, deny child support for Julie, and order DNA or blood testing to determine his paternity of Julie.

A master held a hearing on the paternity issue on November 15, 2005. Appellee's counsel called Ms. Duckworth. She admitted that she had sexual relations with James Stanton around the time of Julie's conception in April 1992, and said she had "no doubt" at that time that Stanton was Julie's father. Moreover, she claimed that appellee knew in 1992 that she had sexual relations with Stanton.[4] The following ensued:

[APPELLEE'S COUNSEL]: At the time you were having sexual relations though, were you not with [appellee]?

[MS. DUCKWORTH]: No, not during the time that I conceived. No. Darren and I were having marital problems and he was staying with a friend of his in West Virginia and had had sexual relations with another woman. That's what spawned all of this.

[APPELLEE'S COUNSEL]: Did the two of you have any discussions concerning paternity of Julie?

[MS. DUCKWORTH]: Yes.

[APPELLEE'S COUNSEL]: And what was the nature of those discussions?

---

4. Later, on redirect examination, Ms. Duckworth claimed that Stanton also knew that Julie is his biological child.

[MS. DUCKWORTH]: The very next day after I had sexual relations with [Stanton], I had called [appellee] and I had told him what happened. And, we both know it's very easy for me to get pregnant. It always was. And, he told me to wait a week or two and go get a pregnancy test done and we'll decide what to do from there. I waited the week or two, went back and got a pregnancy test done, which, of course, came back positive. And, he and I then started going over the options of abortion, adoption or what to do. There were several other people included in this conversation. My sisters were there. And [appellee] and I together made the decision to keep her . . .

\* \* \*

[APPELLEE' S COUNSEL]: What did the two of you decide then?

[MS. DUCKWORTH]: . . . The second option that [appellee] and I discussed was the option of adoption. That's when the other rest [sic] of the family came in because we were deciding what to do at that time. [Appellee] then, and I together, made the decision to go ahead and keep her . . . And [appellee] promised that he would raise her as his own, that [Stanton] would not be involved in her life, and that would be something between us and it would never be a problem ever.

[APPELLEE'S COUNSEL]: And, did you, in fact, do that thereafter?

[MS. DUCKWORTH]: Yes.

Ms. Duckworth recalled that appellee had a vasectomy in June 1987, after she became pregnant for the third time. Although appellee's sperm count was never checked following his vasectomy, Ms. Duckworth noted that she "never became pregnant" in the ensuing years that she and appellee were together. She added:

I have a very high hormone level so it was very easy for me to become pregnant. And we knew if I wasn't pregnant in several years then, at this point, there was no way he could

impregnate me. And, later, after our divorce, he actually had a sperm count done[.]

According to Ms. Duckworth, Julie lived with her following the divorce until June 2001, when Julie went to live with appellee and his new wife for a year. Julie then resumed living with Ms. Duckworth.[5] Appellee's counsel asked if Julie knew who her real father was when she was staying with appellee. She replied, "Yes." The following transpired:

[APPELLEE'S COUNSEL]: And how did she know?

[MS. DUCKWORTH]: When she turned eight years old, we were up at Hill Top Delight. This was in June of 2001. And, Mr. Stanton since then has had two children. Katie being the oldest who at that time was four or five. I don't know her age. And, Julie and I were there getting ice cream. And Katie came up to Julie and said you're my sister, you're my sister. And I looked back and Mr. Stanton was there with his, the wife. Well, she's not a wife. They never married, but his live-in wife, girlfriend, whatever she is. And Julie kept looking at her odd. And then I went home that night and I called [appellee]. And I told him what happened. And I told him that I felt, at this age, she was eight years old. She was old enough to understand what was going on. And this was one of those things that forever couldn't be kept from her. I asked him how he felt about it. And he said that it was okay. Later he became angry about it.

[APPELLEE'S COUNSEL]: Whenever you said he was okay, what you do mean? What happened after that?

[MS. DUCKWORTH]: I told him that I would tell her that it wasn't a blood issue and that [appellee] was her father, he would always love her, because genetically and biologically he wasn't her father.

---

5. Ms. Duckworth said that Julie occasionally visits with appellee, but not on a fixed or regular schedule. She explained that she did not want Julie to live with appellee because he has been "too lax" with respect to the drug and alcohol consumption of their son, Casey, who lives with appellee at least half the time.

In addition, appellee's counsel asked if she had spoken to Julie recently about the fact that appellee was not her biological father. She replied: "Yes, because [appellee] told her he was going to have blood tests done." The colloquy continued:

[APPELLEE'S COUNSEL]: And when did you have this conversation with Julie?

[MS. DUCKWORTH]: When she come home upset and she told me what [appellee] told her. I guess it was before the last one. So, I guess October, the first week of October. And I told her that he was still her father and that it was not a blood issue. It was over child support and not her because she was very hurt.

[APPELLEE'S COUNSEL]: She understands, does she not, that he is not her biological father then?

[MS. DUCKWORTH]: Yes. But as far as she goes, there is no other man that is her father in any other way but biologically other than [appellee]. He is her father to her.

[APPELLEE'S COUNSEL]: At age twelve, does she understand the difference?

[MS. DUCKWORTH]: Yes.

Ms. Duckworth insisted that she "absolutely oppose[d]" a blood test to determine paternity. She explained: "I am not putting Julie through something like that for something Darren knows very well. He knows. And he has always known. And I am not subjecting my daughter to that. What has happened is hurtful enough. There's no need for it." Ms. Duckworth continued:

I'm not putting my daughter through anything so he can say he proved she wasn't his. I'm not doing that to her.... I mean, I don't know what more to say. I've admitted she's not his. He knows she's not his. This is ludicrous. She's been through enough. She's angry. She was the youngest when we divorced. She always felt that in some way it was her fault after she found out things later ... It would be detrimental to her for him to say I proved she wasn't ...

The following exchange is also pertinent:

[APPELLEE'S COUNSEL]: Why would it be detrimental for her to know who her true father is?

[MS. DUCKWORTH]: She already knows who her true father is and he's sitting beside you, biological or not. I'm not—and then for him, for him to want to prove biologically she's not. That's sick. He knows. Of course, it would be detrimental to her. When he told her it was detrimental. He knew it.

[APPELLEE'S COUNSEL]: When he told her what?

[MS. DUCKWORTH]: That he was going to have blood tests taken to prove she wasn't his.

[APPELLEE'S COUNSEL]: And do you think it was detrimental to her whenever you told her who her biological father was?

[MS. DUCKWORTH]: No.

[APPELLEE'S COUNSEL]: That was not detrimental at all?

[MS. DUCKWORTH]: Absolutely not, because I made it very clear it wasn't a blood issue. [Appellee] is now making it a blood issue.

On cross-examination, Ms. Duckworth testified that soon after Julie was born, Stanton "signed papers and was willing to give [Julie] up for adoption[,]" so that appellee could adopt her. These papers were never filed, according to Ms. Duckworth, because she and appellee learned "that Darren did not have to adopt her in order for us to keep her and have full custody and all that."

Mr. Kamp testified that he had a vasectomy around 1988, but insisted that the operation was not "guaranteed a hundred percent." The following ensued:

[APPELLEE'S COUNSEL]: I'm asking you, are you positive, or do you have any way of knowing for sure that you are not the father of Julie?

[APPELLEE]: Never a hundred percent. The vasectomy, they never guaranteed a hundred percent. That's all they said. It wasn't a guaranteed operation.

[APPELLEE'S COUNSEL]: You heard Vicki's testimony concerning her relationship with Mr. Stanton. Would you recall for the court your recollection of what happened at that time?

[APPELLEE]: Well, apparently, I mean, whenever it was going on, I had just a neighbor that lived in the building that had told me that he thought that [Stanton] was staying there overnight. And then we had—I had questioned her about it. And she admitted to it. And then like later on, we found out that she had got pregnant over the situation. But before that deal happened, I do recall finding him and beating him up . . .

[APPELLEE'S COUNSEL]: Now, what happened—how did you find out that she was pregnant?

[APPELLEE]: She told me.

[APPELLEE'S COUNSEL]: And you heard her recollection of the conversations. Would you recount your recollection of the conversations that the two of you had concerning her pregnancy?

[APPELLEE]: Well, she just—when she said she was pregnant, you know, we talked about other options. And what it come down to is, we just moved away so we didn't have to deal with people in the local area. We moved away. And Julie was born up in West Virginia.

[APPELLEE'S COUNSEL]: And, at that point in time, did you know for sure who the father of Julie was?

[APPELLEE]: Never a hundred percent. We just talked and assumed that—who was involved in the relation.

THE MASTER: So you—you were told Mr. Stanton was the father?

[APPELLEE]: Well, we assumed because nobody did any other surgery, I guess. I didn't do anything as far as checked to see if I was a hundred percent.

THE MASTER: All right. But, what Ms. Duckworth talked about, you and her talked about the possibility [that] Mr. Stanton was the father?

[APPELLEE]: Yes.

[APPELLEE'S COUNSEL]: And did you have any tests done at that time?

[APPELLEE]: No.

[APPELLEE'S COUNSEL]: And were you, in fact, still having sexual relations with her?

[APPELLEE]: Yes.

The Master interrupted to warn appellee that his testimony was contradictory to sworn statements he had made in his "Answer to Motion for Modification, Request for Child Support, and Request for Paternity Determination." In that pleading, appellee attested:

> [Appellee] states that the minor child, Julie Kamp, is not his biological daughter. Moreover, he has not adopted the said Julie Kamp, and requests this Honorable Court to order [a] blood test for DNA testing for the purpose of establishing paternity of Julie Kamp. The issue of paternity was recently raised by the said Vicki Jo (Kamp) Duckworth when she began to indicate to Julie Kamp and to others that Darren G. Kamp was not, in fact the biological father of Julie Kamp.

The Master stated:

> He [i.e., Mr. Kamp] has indicated to this court that he *recently* learned that he may not, in fact, be the father of Julie. The testimony that we've heard here today and what he just confirmed, *is he knew from the beginning the possibility that he was not the father.* (Emphasis added).

Notably, appellee's counsel responded: "And we stipulate to that. We admit that." The master responded: "Why are we having this hearing?" The following ensued:

[APPELLEE'S COUNSEL]: When did the issue of paternity—what did the two of you decide to do with regard to Julie's fatherhood, if you will?

[APPELLEE]: We decided to raise her with the other kids.

[APPELLEE'S COUNSEL]: And did you make any pact or agreement with regard to telling anyone else in the world

as to whether or not there was a possibility that you may not be the father?

[APPELLEE]: Did we ever make the agreement?

[APPELLEE'S COUNSEL]: Right. What was your agreement?

[APPELLEE]: Well, we never really made an agreement. We just assumed.

[APPELLEE'S COUNSEL]: Assumed what?

[APPELLEE]: That I wasn't the father.

On cross-examination, appellee admitted that a recent test of his sperm count showed it was not sufficient to impregnate. But, he noted that the test was taken ten years after the vasectomy. He acknowledged that he never sought to check the success of the vasectomy when Julie was conceived. The exchange continued:

[APPELLANT'S COUNSEL]: Why not?

[APPELLEE]: I never did. I don't know why.

[APPELLANT'S COUNSEL]: Well, you say now you want to know for sure. Why didn't you want to know back when the child was born?

[APPELLEE]: I never had the reason to do it with that. This was in my second marriage.

[APPELLANT'S COUNSEL]: Okay. You never had any reason to find out?

[APPELLEE]: No. We never pushed the issue. And now it is.

[APPELLANT'S COUNSEL]: Let's be honest. The reason we're doing it now is because what, because we're here on the issue of child support?

[APPELLEE]: Because I want to know. I want to know.

[APPELLANT'S COUNSEL]: Isn't that the only reason we're here right now?

\* \* \*

[APPELLEE]: I want to know. If I—say I become wealthy and I want to will somebody something. If Julie is

mine it would make a difference in a blood thing or not. It could be. I don't know. I want to be able to make a decision whether—I know a hundred percent that she's not mine. I want to know.

[APPELLANT'S COUNSEL]: Well, you didn't want to know in 2003 when you signed this document saying that she was yours?

[APPELLEE]: That I signed that she was mine?

[APPELLANT'S COUNSEL]: Yeah.

[APPELLEE]: Biological.

[APPELLANT'S COUNSEL]: It says a party born of the marriage.

[APPELLEE]: Okay.

[APPELLANT'S COUNSEL]: Four children were born of issue of a now dissolved marriage.

[APPELLEE]: Okay.

[APPELLANT'S COUNSEL]: Is that your signature[?]

[APPELLEE]: Yeah.

[APPELLANT'S COUNSEL]: Okay. So now all of a sudden you want to know because you may come into some money and you want to know if it's going to affect inheritance rights?

[APPELLEE]: No. It's just an example I'm giving you. Okay. It was just an example. It's just to know the fact. Would—I mean, anybody in the world probably would want to know the true fact.

[APPELLANT'S COUNSEL]: Well, what I'm trying to figure out from you is why from the time [Julie] was born until you get a Motion to Increase how much child support you are going to pay, at no time during that period of time did you ever take any efforts to 1) find out if your sperm count was sufficient enough to impregnate your wife at that time, or try to have a court order genetic testing, at no time during that, did you ever take any effort to find out until the time a motion to increase how much child support you pay is

filed. Then, all of a sudden, we're worried about inheritance rights?

[APPELLEE]: No. It's just a coincidence, you know, because it happened all at once.

[APPELLANT'S COUNSEL]: Happened all at once, this was in 2003. You could have raised that issue at this time.

[APPELLEE]: I never did it.

Kelley Duckworth, sister-in-law of Ms. Duckworth, testified about a conversation she had with appellee after Julie's conception. The two discussed the possibility that Mr. Kamp was the father. "But when Julie was born," she stated, "it was very obvious who she looked like, and that was [Stanton]. And we had that discussion, me and Mr. Kamp."

After hearing arguments from the parties' attorneys, the Master indicated that he believed appellee had waived his right to raise the issue of Julie's paternity. He continued:

I still believe, Mr. Kamp, that the Affidavit that you signed, that I don't believe—I do believe that you attempted to mislead the court and to bring up an issue that, in fact, was not—I think you mislead the court in the assumption that you just found out about this. I think you've known about this since April of 1992. This is not a new disclosure to you. This is not new evidence. You have not just found out that Julie may not be your child.

The Master recommended that the court decline appellee's request for genetic testing. Appellee filed exceptions, asking the court to "order blood or genetic testing in this case."

The circuit court held an exceptions hearing on January 4, 2006, at which the parties presented argument. The court issued an Order on January 9, 2006, granting appellee's exceptions and ordering genetic testing.[6]

---

6. Ms. Duckworth, *pro se,* filed a "Motion for reconsideration and to receive a court appointed attorney" on January 19, 2006. Appellee filed an "Answer to Motion for Reconsideration," asking that Ms. Duckworth's motion for reconsideration be denied. The court denied the motion on February 8, 2006.

As noted, the test results, filed with the court on April 12, 2006, excluded Mr. Kamp as Julie's biological father. Based on the test results, on May 25, 2006, appellee filed a motion to terminate his child support obligation for Julie. He averred: "[I]t would be in the interests of justice for this Court to terminate Mr. Kamp's obligation to pay child support for Julie Kamp...." The Master conducted an evidentiary hearing on July 12, 2006, with respect to DSS's motion for modification of child support and appellee's motion to terminate his support obligation.[7]

At the hearing, appellee recited the circumstances surrounding Julie's birth. He also claimed that Ms. Duckworth's affair led him to file his divorce action in 1999. In that proceeding, he requested custody of Julie, alleging under oath that she was his daughter. Appellee explained that, at the time, he did not take any steps to ascertain Julie's paternity, because he "was trying to do the right thing for the kids" and "figured that Julie didn't need to know."

Mr. Kamp insisted that when he and Ms. Duckworth reached their agreement in 2003, he was not trying to mislead the court by alleging that Julie was his daughter. He explained that he thought it would "be really hard on Julie for her to know the facts that what had happened [sic]." Appellant's counsel produced appellee's 2003 tax return, in which he listed Julie as his daughter and a dependent. The transcript continues:

[APPELLANT'S COUNSEL]: Now, you're asking the court here to declare that you're not Julie's dad any more. Isn't that true?

[APPELLEE]: Through the DNA testing that biologically I'm not.

[APPELLEE'S COUNSEL]: Objection. I believe that the Petition simply asks that the child support be terminated.... We simply asked that child support be terminated.

---

7. Ms. Duckworth appeared without counsel.

\* \* \*

[APPELLANT'S COUNSEL]: So, what are you trying to accomplish through your filing?

\* \* \*

[APPELLEE]: That child support be terminated.

[APPELLANT'S COUNSEL]: If as a result of not having to pay child support, you're also willing, if that's what the court decides, to give up all the privileges that go along with being a dad to Julie?

[APPELLEE]: Well, it's—a lot of it has to do with Julie. She's fourteen years old. Well, she'll be fourteen in December. I think she should have a little bit of say in this situation. You know.[8]

Appellee recalled that he spoke to Julie's therapist, Andrea Barnard, several months prior to the hearing, and told her that he was "not looking to end [his] relationship" with Julie. Indeed, on November 19, 2005, he sent a letter to Ms. Duckworth and her family indicating that his current wife would be willing to adopt Julie and assume total responsibility for her care.

On cross-examination by his own attorney, appellee testified that he and Ms. Duckworth had agreed years ago not to tell Julie that Mr. Kamp is not her biological father. He blamed Ms. Duckworth for raising the subject with Julie.

When the master questioned appellee about his request to terminate his financial support for Julie, appellee explained that he wanted to terminate child support because Ms. Duckworth did not let him see Julie very often, called his home to harass him, and these disputes were causing problems in his marriage. Mr. Kamp stated that he had not sought relief from the court to enforce his visitation and custody rights, explaining: "I don't have the time or the money to spend on court."

---

8. Appellee also detailed the difficulties he had with Ms. Duckworth, including her alleged obstruction of his visitation with Julie.

In response to questions posed by Ms. Duckworth, appellee asserted that he and Ms. Duckworth had agreed that they would never tell Julie about her parentage. On redirect, Mr. Kamp recalled that Ms. Duckworth advised him, on Mother's Day of 2002, that she had informed Julie that Stanton is her father.

Appellant's counsel then called Ms. Duckworth, who recounted that Stanton's daughter approached Julie in June 2001, telling her that they are sisters. She informed appellee about what happened, and advised that she would tell Julie that Stanton is her father. She also addressed her financial circumstances.

On cross-examination, appellee's counsel asked why Ms. Duckworth had not tried to seek child support from Stanton. She replied: "Because Mr. Kamp is her father." She added that she did not want Stanton involved in Julie's life. Moreover, because of Julie's fears that any effort to collect child support from Mr. Stanton would provide him with an opportunity to have contact with Julie, Ms. Duckworth testified that she would not seek support from Mr. Stanton.[9]

Andrea Barnard, a therapist, was called by DSS.[10] She testified, based on four months of therapy sessions with Julie, that Julie regarded Mr. Kamp as her father, and "did not want to start a [parental] relationship with a man she did not know." Moreover, Ms. Barnard explained that Julie had formed the idea that if the court terminated appellee's child support obligation, he would not be her father anymore, and she would have to establish contact with Stanton instead.

Appellant also called Stanley Wilt, the husband of Ms. Duckworth's sister. He indicated that he had "always known"

9. As noted, Ms. Duckworth had previously stated that Stanton "signed papers" when Julie was born so that appellee would have custody.

10. Ms. Barnard stated that she worked at Burlington Family Services, but the record does not include her credentials. In her testimony, Ms. Barnard refers to a letter she wrote to the court reciting her opinions. However, the letter is not in the record. Nor was Ms. Barnard offered as an expert.

that Stanton is Julie's biological father. Wilt's wife, Maronda Wilt, testified that when Ms. Duckworth was pregnant with Julie, appellee admitted he was not Julie's biological father. Although she did not specify a date when appellee made this admission, Wilt recalled that appellee had "several different confrontations" with Stanton. Appellant also called Ms. Duckworth's sister-in-law, Kelley Duckworth, and her neighbor, Christopher Ashley Lang, both of whom testified that Casey spent between three to five nights a week with his mother. Casey offered similar testimony.

On September 25, 2006, after receiving memoranda from the parties, the Master recommended granting appellee's motion to terminate child support and deeming "any and all" arrears uncollectible.[11] The master found that Mr. Kamp had always known that he is not Julie's biological father, yet had treated her as his daughter. However, because the genetic test results showed that Mr. Kamp is not Julie's natural child, the master concluded that the presumption of legitimacy had been rebutted, and recommended the termination of child support.

Appellant filed exceptions on September 28, 2006. Appellant's Exception Two stated: "That the master erred in that he terminated current and back Child Support without vacating paternity of the Defendant." Exceptions Twelve and Thirteen claimed, respectively, that the Master "failed to consider the best interest of the child in his ultimate decision to terminate current and past support and set aside or vacate paternity," and "erred in that he failed to consider the emotional damage that would occur for [sic] the decision to set aside or vacate Paternity in this case." The court held an exceptions hearing on January 4, 2007, at which it heard arguments but did not receive evidence.

The circuit court rejected the exceptions in an "Opinion and Order" ("Opinion") entered January 19, 2007. The Opinion stated, in part:

---

11. The record does not disclose the existence of arrears.

2. This was a case to establish the proper amount of child support, and the Master made his recommendations based on the evidence before him, which included the DNA results excluding Mr. Kamp as Julie's father thereby removing any statutory duty to pay child support for her. [Md. Code, Family Law Article] § 5–203(b). Further, there is no paternity order to vacate. The child, Julie, was presumed to be Mr. Kamp's as a child born of the marriage. This presumption was nullified by the DNA results.

\* \* \*

7. The parties argued equitable estoppel by way of memoranda submitted to the Master. . . .

In the case at bar, the first element of equitable estoppel [i.e., voluntary conduct or representation] is clearly proven. Mr. Kamp acted as Julie's father. The second element, reliance, is not as clearly present. Although Julie relied on Mr. Kamp's representations completely up until 2001 or 2002, there came a time when she learned the truth. Ms. Duckworth continued to rely on Mr. Kamp paying child support, yet knew or should have known that the foundation of that reliance had been shaken, as Julie now knew the truth about her parentage that the rest of the family had known for years. Regardless, BOSE and Ms. Duckworth failed to prove the third element, detriment, as defined in *Markov*, to equitably estop Mr. Kamp's child support obligations from being eliminated. Past financial benefits to Mr. Kamp or detriments to Ms. Duckworth do not constitute the element of detriment as defined by the *Markov* court. There is nothing preventing Ms. Duckworth from seeking child support from Mr. Stanton, the alleged natural father.

In its decision to order the DNA testing, the court considered the various factors involved. The parties were separated and the truth about Julie's parentage was out. There was no family unit to protect. In this instance, there was no reason not to obtain indisputable medical evidence to confirm the truth about Mr. Kamp's relation to Julie.

Whenever the status of the law is such that there is little or no interest in the truth, then there is something wrong with the system or the law.

\* \* \*

12. It is clear from a reading of the Report of the Master and the transcript that the Master had extensive knowledge of this case, the parties, and the children involved. It is also clear that he considered the interests of Julie in making his decision. The truth about her parentage was already well known. There was no testimony to indicate that Ms. Duckworth could not get child support from Mr. Stanton. The Master clearly took these things into consideration while properly applying Maryland law when making his recommendations.

13. First, the Master did not vacate paternity. Second, in his report, the Master clearly identified some of the effects these proceedings have had on Julie. Further, Julie already knew that Mr. Kamp was not her biological father. Any emotional damage resulting from that knowledge cannot be attributed to a Master's hearing or recommendation some five years after the fact.

Along with the Opinion, the circuit court issued two orders. One provided that appellant's exceptions were denied. The other denied appellant's motion for modification; granted appellee's motion to terminate his child support obligation; and ordered that "any and all arrearages are deemed uncollectible."

We shall set forth additional facts in our discussion.

## DISCUSSION.

### I.

Appellant contends that the circuit court erred because, "years after [appellee's] parental obligations ... were conclusively established in the divorce decree and in a later enrolled judgment ...," the court revised its prior orders establishing

appellee's paternity of Julie. DSS advances several grounds to support its contention. In sum, it claims that the court's ruling was not authorized by Rule 2–535(b) or the Family Law Article, and that the court should have rejected appellee's attempt to vacate paternity based on the doctrines of *res judicata*, judicial estoppel, equitable estoppel, and laches.

In appellant's view, Rule 2–535 did not authorize the court to revise an enrolled judgment because the judgment was not entered as a result of fraud, mistake or irregularity within the meaning of the rule. According to DSS, appellee cannot rely on fraud or mistake because he did not "mistakenly acknowledge Julie as his daughter." To the contrary, argues appellant, Kamp knew, at least by the time of his divorce from Duckworth in 1999, that he is not Julie's biological father. Thus, appellant maintains that "the record reveals no basis whatsoever justifying the circuit court's belief that it could simply decline, on the basis of Mr. Kamp's change of position, to give conclusive effect to the judicial finding in its 1999 Judgment of Divorce and later order that Julie is Mr. Kamp's daughter."

Further, appellant claims that appellee could not avail himself of Rule 2–535 because he failed to act with "ordinary diligence" in seeking revision of the Judgment. Indeed, in the fourteen years between Julie's birth and the motion to modify, notes appellant, appellee never challenged Julie's paternity. Instead, claims appellant, Kamp "consistently us[ed] his open acknowledgment of being [Julie's] father to his personal and litigation advantage."

Moreover, DSS observes that, even after Julie learned in 2002 that Stanton is her biological father, appellee continued to allege in court proceedings that he is Julie's father. According to appellant, the matter of paternity cannot be reopened based on appellee's "much belated second thoughts, plainly triggered by [appellant's] motion to increase child support and his anger at Ms. Duckworth regarding disputes that arose long after the divorce[.]"

DSS also looks to Maryland Code (1984, 2006 Repl. Vol.), § 5–1038(a) of the Family Law Article ("F.L."), pertaining to the use of genetic tests to reopen paternity judgments. DSS argues that, to the extent the circuit court relied on F.L. § 5–1038(a), it erred, because that provision applies only to the putative father of a child born out-of-wedlock. Appellant, however, is not a "putative father," because Julie was born during the marriage, and appellee's obligations to her were established in a divorce proceeding, rather than by way of a paternity decree.

Alternatively, DSS argues that, "even if Julie's paternity had been established in a paternity proceeding," F.L. § 5–1038 would not apply, as a "declaration of paternity may not be modified or set aside [due to a genetic test exclusion under F.L. § 5–1029] if the individual named in the order acknowledged his paternity knowing he was not the father." Here, appellant claims, "it is undisputed that Mr. Kamp had a vasectomy in 1987, five years before Julie's birth," and knew that "another man was the biological father," yet he held himself out as Julie's father for many years.

In addition, appellant contends that the doctrines of claim preclusion and *res judicata* bar appellee's attempt to terminate his support obligation, as appellee never "previously raise[d] the claims on which he now relies to attack the provisions of the decree related to his obligations to Julie." DSS posits that, given appellee's failure during the divorce litigation to assert that he is not Julie's father, appellee cannot "create an entirely new and inconsistent attack on the provisions of a prior final judgment." Rather, argues appellant, the provisions of the enrolled 1999 Judgment are "binding" on Kamp, because he was "well aware of the facts that, at least should have led him to doubt his paternity [of Julie], he was on notice of his right to have presented that challenge prior to the earlier judgments, through genetic testing or with other evidence." DSS adds that appellee "had every opportunity to present his defense unhampered by an[y] fraud, mistake or irregularity," yet "he chose not to present those arguments until it was convenient for him to change his position, and the

circuit court erred in allowing him to relitigate the issue of his paternity six years later."

Further, appellant maintains that the doctrine of judicial estoppel precludes appellee from asserting that he is not Julie's father. In appellant's view, appellee should not derive unfair advantage by his inconsistent position in now denying paternity of Julie. Appellant also argues that the doctrine of laches bars appellee from raising the paternity issue, "as he sat on his rights far too long."

Finally, appellant relies on the doctrine of equitable estoppel to bar appellee's denial of paternity. According to DSS, appellee voluntarily represented that he is Julie's father, and he and Ms. Duckworth relied on that representation in settling their divorce action, by agreeing that appellee would continue to support Julie. DSS criticizes the circuit court's conclusion that this produced "no financial detriment since Ms. Duckworth could now seek support from Mr. Stanton, the putative biological father." It argues:

> The circuit court's analysis is erroneous for at least the following reasons. First, the court did not set support consistent with the child support guidelines with regard to the pending motion to modify, and precluded Julie from collecting any arrears. Nor can Julie ever recover the larger amount of child support she might have received had not Mr. Kamp, while declaring in court that he was her father, paid reduced amounts because of joint custody arrangements. These consequences alone are a financial detriment to Julie that cannot be cured by any future attempt to establish Mr. Stanton's paternity.

> Second, numerous definitive and irrevocable decisions were made in reliance upon Mr. Kamp's acknowledgment of responsibility for Julie, which are not subject to being remedied more than a decade later. *Most obviously, Mr. Kamp was ready to adopt Julie before the divorce, cementing his parentage notwithstanding the lack of a biological connection to her, and Mr. Stanton had executed papers terminating any parental rights. Instead, in reliance upon*

*Mr. Kamp, the parties settled their divorce with an agreement, incorporated into a final divorce judgment, in which Mr. Kamp accepted his obligations to be Julie's father ....*

Third, accepting for argument's sake the trial court's view that it is not terminating Mr. Kamp's rights and obligations to Julie, with the one exception of child support, the court's order may have effectively precluded seeking support from Mr. Stanton. *If, as the court below seems to sincerely believe, it has not terminated Mr. Kamp's parental rights, it is not at all clear that the State or Ms. Duckworth can successfully file a paternity claim against Mr. Stanton.* Mr. Stanton could, and presumably would, not only assert accurately that Julie was born during a marriage, but that the court still considers Mr. Kamp to be Julie's legal father. By attempting, literally, to 'split the baby,' *the court has left Julie in a legal limbo that could very well preclude any resort to Mr. Stanton for child support.*

*Finally, but perhaps most importantly, the court below failed to give any weight to Julie's interest in this matter.* She does not want a relationship with Mr. Stanton, and Ms. Duckworth, out of concern for Julie's well being, indicated that she will not pursue child support from Mr. Stanton.[1]

(Emphasis added.)

Appellee responds that "[t]he circuit court was well within its authority to terminate child support in this case." He avers that he did not seek to terminate paternity, or revise a prior order concerning paternity, but "merely asked that his obligation to pay child support be terminated," which was his right under F.L. § 12–104(a). According to appellant, the results of the genetic test established a material change in circumstances, which justified a change in child support. In addition, he claims that the genetic test rebutted the statutory presumption that the court should apply Maryland's child support guidelines. He maintains that application of the guidelines "would be unjust or inappropriate" in this case.

Further, appellee insists that the court properly granted his request for a paternity test. Noting that Md.Code (2001, 2006

Supp.), § 1–206 of the Estates and Trusts Article ("E.T.") applies when a child is born during a marriage, appellee argues that the court "should look to the best interests of the child in making it's [sic] determination as to whether or not to grant a blood test." In his view, the circuit court "was quite clear in its indication … that the genetic test was in the best interests of the minor child."

Moreover, appellee points out that appellant did not raise below its Rule 2–535 argument. In any event, he asserts that there was "no need to apply Rule 2–535 to this case," because "the Circuit Court never ruled that the Appellee was not the father of Julie Kamp," nor did he request such relief. Rather, appellee merely asked the court to terminate prospective child support. In addition, appellee contends that F.L. § 5–1038(A) does not apply here. He argues that "the authority for a reduction in child support is based on the analysis [governing] child support modification," and insists that he "is not estopped from arguing for a decrease in child support."

Appellee also argues that, even if the court could have abated any arrearages, the point is "moot" because there were no arrearages. He asserts: "When the Appellee requested the court to suspend his child support obligation, the court refused. Therefore, the Appellee paid all of his child support as directed until such time as the child support obligation was terminated by the Circuit Court Order." Finally, appellee notes that appellant cannot rely on laches because it did not raise that contention in the proceedings below.

## II.

■ Appellant challenges two judicial orders: the order for genetic testing and the resulting order terminating appellee's child support obligation. As a preliminary matter, we consider whether the order for genetic testing is now moot, given that the test has already been performed and the results have been disclosed.

■ " 'A case is moot when there is no longer an existing controversy between the parties at the time it is before the

court so that the court cannot provide an effective remedy.' " *Floyd v. Mayor and City Council of Baltimore*, 179 Md.App. 394, 429 n. 22, 946 A.2d 15 (2008) (quoting *Coburn v. Coburn*, 342 Md. 244, 250, 674 A.2d 951 (1996)); *see Hill v. Scartascini*, 134 Md.App. 1, 4, 758 A.2d 1087 (2000). Appeals " 'which present nothing else for decision are [generally] dismissed as a matter of course.' " *Albert S. v. Department of Health and Mental Hygiene*, 166 Md.App. 726, 743, 891 A.2d 402 (2006) (quoting *In re Riddlemoser*, 317 Md. 496, 502, 564 A.2d 812 (1989)). This is because any decision as to such an issue "would amount to an academic undertaking; appellate courts 'do not sit to give opinions on abstract propositions or moot questions.' " *Albert S.*, 166 Md.App. at 743–44, 891 A.2d 402 (quoting *Riddlemoser*, 317 Md. at 502, 564 A.2d 812). *See generally Board of Physician Quality Assurance v. Levitsky*, 353 Md. 188, 200, 725 A.2d 1027 (1999); *Atty. Gen. v. Anne Arundel Co. Sch. Bus Contractors Ass'n*, 286 Md. 324, 327, 407 A.2d 749 (1979); *Committee for Responsible Development on 25th Street v. Mayor of Baltimore*, 137 Md.App. 60, 69, 767 A.2d 906 (2001).

■ Here, regardless of our ruling, we cannot remedy the consequences of the court's order permitting genetic testing, as the test has been completed and the results disseminated. In effect, we cannot unring the bell. Nevertheless, we will consider the matter, for two reasons. First, there is an exception to the rule that we will not consider moot questions, if "the issue presented is 'capable of repetition, yet evading review.' " *Albert S.*, 166 Md.App. at 746, 891 A.2d 402 (quoting *Stevenson v. Lanham*, 127 Md.App. at 612, 736 A.2d 363 (citations omitted)). This is just such a case; a circuit court order allowing a genetic test will generally reach us after the test has already been performed. Second, regardless of the propriety of the order permitting genetic testing, the court relied on the genetic test results in terminating appellee's child support obligation. If the court erred in ordering the genetic test to contest paternity, that error could affect the court's order terminating appellee's child support obligation for Julie.

## III.

 E.T. § 1–206(a) provides: "A child born or conceived during a marriage is presumed to be the legitimate child of both spouses." Put another way, "a husband is presumed to be the father of a child born to his wife during their marriage." *Ashley v. Mattingly,* 176 Md.App. 38, 51, 932 A.2d 757 (2007). Julie was indisputably born during appellee's marriage to Ms. Duckworth. Therefore, under E.T. § 1–206(a), appellee is presumed to be Julie's father.

The same result obtains under the Paternity Act, codified at F.L. §§ 5–1001 to 5–1048. Although that statute largely pertains to children born out of wedlock, F.L. § 5–1027 is relevant. It provides, in part:

**§ 5–1027. Trial to be held after birth of child—Burden of proof; presumptions; testimony.**

\* \* \*

(c) *Presumption.*—(1) There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception.

(2) The presumption set forth in this subsection may be rebutted by the testimony of a person other than the mother or her husband.

(3) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, it is not necessary to establish nonaccess of the husband to rebut the presumption set forth in this subsection.

(4) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, both the mother and her husband are competent to testify as to the nonaccess of the husband at the time of conception. . . .

Thus, appellee is presumed to be Julie's father under F.L. § 5–1027(c), because Julie was conceived during Kamp's mar-

riage to Duckworth. *See Ashley,* 176 Md.App. at 55, 932 A.2d 757.

Appellee sought to rebut the presumption of paternity by requesting a DNA test. We considered a similar request in *Ashley.* There, the appellant, Ashley, married the appellee, Mattingly, in 1990. The marriage took place after Mattingly had expressly represented to Ashley that she was not pregnant. *Ashley,* 176 Md.App. at 41, 932 A.2d 757. Eight months after the marriage, Mattingly gave birth to a son, Chase. At the time of Chase's birth, Mr. Ashley believed he was the father because of Mr. Mattingly's express, false representation that she was not pregnant at the time they wed. *Id.* The parties separated the following month. *Id.* Ashley filed for divorce in 1992, alleging that the parties had a son and requesting reasonable visitation. In her answer, Mattingly also asserted that the parties were the parents of Chase. *Id.* The trial court issued a judgment of absolute divorce, which awarded sole custody of Chase to Mattingly, granted Ashley reasonable visitation, and ordered him to pay child support. *Id.* Twelve years after the divorce, Ashley developed the belief that Chase was not his biological son, and filed a "Complaint for Discontinuance of Child Support and Request for Paternity Testing." *Id.* at 42, 932 A.2d 757. The trial court granted the mother's motion to dismiss the complaint. *Id.* at 42–43, 932 A.2d 757.

On appeal, we held that, as to the request for genetic testing, the trial court erred in granting the motion to dismiss. *Id.* at 62, 932 A.2d 757. After reviewing the Paternity Act and other statutory provisions, along with other appellate cases, we held that E.T. § 1–206(a) applied, because Chase was *born* during the parties' marriage, even if, arguably, he was not *conceived* during the marriage. *Id.* We said, *id.* at 62–63, 932 A.2d 757 (emphasis added):

> *[T]he court had discretion to order genetic testing to determine paternity if it first determined that it was in the child's best interest to do so. Because the court did not recognize that it had such discretion, it erred. See Beverly v. State,* 349 Md. 106, 127, 707 A.2d 91 (1998) (finding

reversible error, resulting in a remand for a new sentencing, where sentencing judge failed to recognize "that she had discretion to sentence in accord with the plea agreement"). Therefore, we shall vacate the judgment and remand for further proceedings, at which the circuit court must consider whether it is in Chase's bests interests to order genetic testing.[ ]

Of import here, the *Ashley* Court instructed that, in deciding whether to order genetic testing, the circuit court had to consider whether such testing comported with the best interests of the child. *Id.* at 62, 932 A.2d 757. Courts in other jurisdictions have reached similar results. *See, e.g., Baker v. Baker,* 276 Ga. 778, 582 S.E.2d 102, 104 (2003) (holding that the "best interests of the child" standard applies when considering a presumed father's "petition seeking to delegitimize the child."); *In re Marriage/Children of Betty L.W. v. William E.W.,* 212 W.Va. 1, 569 S.E.2d 77, 86 (2003) ("a reviewing court must examine the issue of whether an 'individual attempting to disestablish paternity has held himself out to be the father of the child for a sufficient period of time such that disproof of paternity would result in undeniable harm to the child.' ") (citation omitted); *Godin v. Godin,* 168 Vt. 514, 725 A.2d 904, 910 (1998) (noting that "the State retains a strong and direct interest in ensuring children born of a marriage do not suffer financially or psychologically merely because of a parent's belated and self-serving concern of a child's biological origins," and declining to reopen a paternity declaration in a divorce judgment "absent clear and convincing evidence that it serves the best interests of the child."). *See also* Jana Singer, "Marriage, Biology, and Paternity: the Case for Revitalizing the Marital Presumption," 65 MD. L. REV. 246, 264 (2006) (collecting and discussing cases that have applied the best interests standard in considering requests for genetic testing).

The record here does not reflect that the court considered Julie's best interests prior to ordering the genetic test. Because the circuit court did not consider Julie's best interests, it erred in ordering the genetic testing.

In *Ashley,* "we express[ed] no opinion on the merits of whether it would be in Chase's best interest for the court to order genetic testing or any other relief in the event that the [genetic] testing definitely establish[ed] that [Ashley] is was not Chase's biological father." *Id.* at 63, 932 A.2d 757.[12] In a footnote, however, we provided guidance to the court on remand. The Court observed that, when a party learns he is not the child's father, but waits to file suit challenging paternity, "the length of delay may have a bearing on the 'best interest' analysis." *Id.* at 63, n. 14, 932 A.2d 757. We also recognized that the State has a vital " 'interest in ensuring [that] children born of a marriage do not suffer financially or psychologically merely because of a parent's belated and self-serving concern of a child's biological origins[.]' " *Id.* at 63, n. 15, 932 A.2d 757 (citation omitted).

In addition, the *Ashley* Court cited favorably to the ruling in *Culhane v. Michels,* 615 N.W.2d 580 (S.D.2000). *Ashley,* 176 Md.App. at 63, n. 15, 932 A.2d 757. In that case, the parties agreed to end their marriage when their two children were four and six years of age, respectively. The parties entered into a property settlement and child custody agreement that was later adopted by the circuit court. Eleven years later, the former wife, Culhane, sued the former husband, Michels to recover delinquent child support. Michels moved for paternity testing to determine whether he was the biological father of the younger daughter. The trial court denied his request, and the Supreme Court of South Dakota affirmed. It reasoned, 615 N.W.2d at 589 (citations omitted):

> *Belated efforts to declare a child illegitimate, for whatever reasons, should seldom prevail.* Michels has failed to

---

**12.** That determination would be subject to appellate review for abuse of discretion. The Court of Appeals has described the concept of abuse of discretion in various ways, "all of them setting a very high threshold." *Wilson-X v. Dept. of Human Resources,* 403 Md. 667, 677, 944 A.2d 509 (2008). *See also Wilson v. John Crane, Inc.,* 385 Md. 185, 198–99, 867 A.2d 1077 (2005); *see Schade v. Board of Elections,* 401 Md. 1, 34, 930 A.2d 304 (2007); *Touzeau v. Deffinbaugh,* 394 Md., 654, 669, 907 A.2d 807 (2006) (same).

show sufficient cause for paternity testing at this late juncture. *The welfare of the child must be considered over the father's long delayed challenge to the child's parentage. Michels has treated both children as his own since birth.* He claims that his request is not made to recover past child support, but merely to find out if he is the father and whether Culhane perpetrated fraud upon him. These are not compelling enough reasons to disrupt the life of a child born during their marriage. (Emphasis added.)

We observe that the record in the case *sub judice* does not contain any evidence to show that a paternity test was in Julie's best interest. Julie was approximately thirteen years of age by the time the genetic test was ordered. DSS offered evidence that Julie might suffer emotional harm if such a test were ordered at that point. Julie's therapist, Ms. Barnard, testified that Julie did not want a paternal relationship with Stanton. Moreover, Ms. Duckworth claimed that "[i]t would be detrimental" to Julie for appellee to undergo a genetic testing to prove he is not Julie's biological father, because Ms. Duckworth has attempted to make "very clear" to Julie that paternity is not "a blood issue" and appellee "is now making it a blood issue."

## IV.

██ Because the court below erred in ordering the genetic test without first considering Julie's best interest, it follows that the court erred in terminating appellee's child support obligation based on the paternity test results. We would reach this same conclusion, however, even if the circuit court had properly ordered the genetic test. We explain.

Appellant's Exception Two stated: "[T]he Master erred in that he terminated current and back Child Support without vacating paternity of the Defendant." In denying Exception Two, the court said:

This was a case *to establish the proper amount of child support,* and the Master made his recommendations based on the evidence before him, which included the DNA results

excluding Mr. Kamp as Julie's father thereby removing any statutory duty to pay child support for her. [F.L.] § 5–203(b). Further, *there is no paternity order to vacate.* The child, Julie, was presumed to be Mr. Kamp's as a child born of the marriage. *This presumption was nullified by the DNA results.* (Emphasis added.)

In Exceptions Twelve and Thirteen, appellant claimed, respectively, that the Master "failed to consider the best interest of the child in his ultimate decision to terminate current and past support and set aside or vacate paternity" and "erred in that he failed to consider the emotional damage that would occur for the decision to set aside or vacate Paternity in this case." As noted, the court said in its opinion:

12. It is clear from a reading of the Report of the Master and the transcript that the Master had extensive knowledge of this case, the parties, and the children involved. It is also clear that he considered the interests of Julie in making his decision. The truth about her parentage was already well known. There was no testimony to indicate that Ms. Duckworth could not get child support from Mr. Stanton. The Master clearly took these things in to consideration while properly applying Maryland law when making his recommendations.

13. First, the Master did not vacate paternity. Second, in his report, the Master clearly identified some of the effects these proceedings have had on Julie. Further, Julie already knew that Mr. Kamp was not her biological father. Any emotional damage resulting from that knowledge cannot be attributed to a Master's hearing or recommendation some five years after the fact.

Appellee concedes in his brief that he "never requested the court to vacate his paternity. He has merely requested the court to refuse to increase child support as requested by the Appellant and to terminate prospective child support." Clearly, the circuit court did not disturb appellee's parental rights. To the contrary, appellee retained the legal status of Julie's

father. The court erred by relieving appellee of his corresponding duty of parental support.

■ The court held, in effect, that appellee's legal status as Julie's father was irrelevant to his child support obligation. That position contravenes settled Maryland law. The parent of a minor child has a statutory duty to support the child, as well as a common law duty to support and care for the child. *In re Katherine C.*, 390 Md. 554, 570, 890 A.2d 295 (2006); *see Garay v. Overholtzer*, 332 Md. 339, 368–69, 631 A.2d 429 (1993). The statutory duty of support is set forth in F.L. § 5–203:

> **§ 5–203. Natural guardianship; powers and duties of parents; support obligations of grandparents; award of custody to parent.**
>
> (a) *Natural guardianship.*—(1) The parents are the joint natural guardians of their minor child.
>
> \* \* \*
>
> (b) *Powers and duties of parents.*—The *parents of a minor child,* as defined in Article 1, § 24 of the Code: [13]
>
> (1) are jointly and severally *responsible for the child's support,* care, nurture, welfare, and education; and
>
> (2) have the same powers and duties in relation to the child.

(Emphasis added.)

This is not a situation such as in *Walter v. Gunter*, 367 Md. 386, 788 A.2d 609 (2002), upon which the Master relied in recommending termination of child support. In *Walter*, 367 Md. at 392, 788 A.2d 609, a putative father sought to terminate his child support obligation after DNA testing excluded him as the father. He had previously consented to a judgment of paternity in 1993, based on the mother's representations of his paternity. *Id.* at 389, 788 A.2d 609. The Court of Appeals

---

13. Article 1, § 24 of the Code defines a "minor" as one who is eighteen years of age or younger.

framed the issue as follows: "[W]hether a child support order, terminated [ ] by the circuit court prospectively *after the vacatur of the paternity declaration*, may still oblige the father to satisfy arrearage[.]" *Id.* at 392, 788 A.2d 609. (Emphasis added.) The *vacatur* of the paternity declaration in *Walter* eliminated *"the very paternity declaration, from which the child support order originates* [.]" *Id.* at 393, 788 A.2d 609 (emphasis in original.)

Here, Julie was born to Ms. Duckworth during appellee's marriage to her. Therefore, appellee was not a putative father, nor was there any paternity decree to vacate. To the contrary, there were extant *findings*, over the years, that appellee is Julie's father. For example, the 1999 Divorce Judgment referred to the "minor children of the parties; namely, . . . **JULIE KAMP**[.]" The Judgment assigned appellee certain rights to custody of and visitation with Julie. In its Order of March 14, 2003, concerning custody and visitation and incorporating the parties' custody agreement, the court again recited that Julie is appellee's "minor child."

The court's sole basis for finding a "material change in circumstances," justifying the termination of appellee's child support obligation, was that the DNA paternity test excluded appellee as Julie's biological father. Nevertheless, the court did not terminate paternity. Given appellee's continuing legal status as Julie's father, she remains appellee's "minor child." Therefore, appellee is bound by F.L. § 5–203 and his common law duty to support Julie. It follows that the circuit court erred in abrogating appellee's duty of support.

Appellant also argues that the circuit court violated settled Maryland law when it reduced appellee's child support obligation to zero, and eliminated all past due arrears, based on the paternity test. F.L. § 12–202 requires courts to apply a rebuttable presumption that the proper child support award is the amount that would result from application of the guidelines set forth in Title 12 of the Family Law Article. The court did not apply these Guidelines, or consider any evidence

rebutting them, because it erroneously believed appellee had no duty to pay any child support for Julie.

Moreover, the Master's recommendations, and the court's opinion adopting them, do not reflect an examination of Julie's material needs or the parties' financial circumstances. Instead, the court improperly placed on Ms. Duckworth the burden of showing she "could not get child support from Mr. Stanton." The best interest standard does not permit a court to cut off one source of a child's economic support on a mere assumption that another source will arise to fill the void.

■ In our view, the doctrine of laches also barred appellee's request to abrogate his support obligation. We explain.

Preliminarily, appellee complains that the defense of laches was not raised by below by appellant. We disagree. In a memorandum opposing appellee's request to terminate child support, DSS argued:

[O]n the pure grounds of equity, the Court can find that Mr. Kamp failed to raise the defense of non-paternity at the time of the divorce and should not be permitted to do so at this time. He sat on his defense when it was to his advantage, yet now seeks to raise it when it benefits him financially to do so.

■ The "doctrine of laches is based on the general principles of estoppel[.]" *Jahnigen v. Smith*, 143 Md.App. 547, 555, 795 A.2d 234 (2002). Appellant clearly invoked equity and expressly complained about appellee's delay, noting that he "sat on his defense" since the time of his divorce. Those contentions are embodied in the defense of laches, as we shall see, *infra*. To be sure, appellant did not use the term "laches" in opposing appellee's motion to terminate support. But, we decline to "exalt form over substance." *Jones v. State*, 175 Md.App. 58, 77, 924 A.2d 336 (2007); *see generally Watson v. State*, 311 Md. 370, 372 n. 1, 535 A.2d 455 (1988) (where motion *in limine* was ruled upon before trial, and court repeated its ruling just before State's cross-examination of defendant, during which the relevant evidence was elicited, "requiring [defendant] to make yet another objection only a short time after

the court's ruling to admit the evidence would be to exalt form over substance"). We turn to the merits.

We recently considered the defense of laches in *LaSalle Bank, N.A. v. Reeves*, 173 Md.App. 392, 919 A.2d 738 (2007), explaining: "Laches 'is a defense in equity against stale claims, and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society.'" *Id.* at 405, 919 A.2d 738 (quoting *Parker v. Board of Election Supervisors*, 230 Md. 126, 130, 186 A.2d 195 (1962)). Laches bars an action where there has been "both an inexcusable delay and prejudice" to the party asserting the defense. *LaSalle Bank*, 173 Md.App. at 406, 919 A.2d 738. The "defense of laches to the assertion of an equitable remedy must be evaluated on a case by case basis, as laches is an *inexcusable* delay, without necessary reference to duration in asserting an equitable claim." *Id.* at 409, 919 A.2d 738 (emphasis in original). Because the doctrine of laches "is tied to the statute of limitations, 'generally the statute applicable to actions at law will be followed by analogy by the equity courts.'" *Jahnigen*, 143 Md.App. at 555–56, 795 A.2d 234 (quoting *Bowie v. Ford*, 269 Md. 111, 122–23, 304 A.2d 803 (1973)).

A small but growing number of states have passed statutes limiting the amount of time a presumptive father (i.e. the father of a child born or conceived during marriage) has to challenge the paternity of his child. *See e.g.* Cal. Fam.Code § 7630 (presumed father must bring action "within a reasonable time after obtaining knowledge of relevant facts"); Colo. Rev.Stat. § 19-4-107 (a presumed father can vacate paternity "only if the action is brought within a reasonable time after obtaining knowledge of relevant facts but in no event later than five years after the child's birth."); Del.Code. Ann. tit. 13 s. 8-607 ("a proceeding brought by a presumed father ... to adjudicate the parentage of a child having a presumed father must be commenced not later than 2 years after the birth of the child."); 750 Ill. Comp. Stat. 45/8 (a petition by a presumed father "to declare the non-existence of the parent and child relationship ... shall be barred if brought later than 2

years after the petitioner obtains knowledge of relevant facts."); Minn.Stat. § 257.57 (2007) (an action to declare the "nonexistence" of a father-child relationship must be brought "within two years after the person bringing the action has reason to believe that the presumed father is not the father of the child, but in no event later than three years after the child's birth."); N.D. Cent.Code § 14–20–42 ("a proceeding brought by a presumed father . . . to adjudicate the parentage of a child having a presumed father must be commenced not later than two years after the birth of the child."); Tex. Fam.Code Ann. § 160.607 ("a proceeding brought by a presumed father . . . to adjudicate the parentage of a child having a presumed father shall be commenced not later than the fourth anniversary of the date of the birth of the child."); Wash. Rev.Code § 26.26.530 ("a proceeding brought by a presumed father . . . to adjudicate the parentage of a child having a presumed father must be commenced not later than two years after the birth of the child."); Wyo. Stat. Ann. § 14–2–807 ("a proceeding brought by a presumed father, the mother, or another individual to adjudicate the parentage of a child having a presumed father shall be commenced within a reasonable time after obtaining knowledge of relevant facts, but in no event later than five (5) years after the child's birth.")

Unlike the states mentioned above, Maryland has not enacted a statute of limitations to govern the situation *sub judice.* Nevertheless, the general principles of laches, as they have been applied in Maryland, suggest that appellee's prolonged delay in challenging Julie's paternity bars his request to terminate support. Appellee knew or had reason to know since 1992 that Julie is not his biological daughter. Moreover, appellee filed for divorce in 1999, and averred that Julie was his child. By waiting until 2005 to assert a paternity challenge, when Julie was about thirteen years of age, appellee slept on his rights.

Moreover, to excuse appellee's lack of diligence and allow him to proceed with his long-delayed claim would result in serious financial prejudice to Ms. Duckworth, as well as finan-

cial and emotional harm to Julie. As the evidence showed, Julie has always regarded appellee as her father. Appellee suggests that he has not sought to undo his status as Julie's father. Rather, he merely wants to terminate his support obligations, based on his lack of biological parentage. They are the equivalent in Julie's mind, according to Ms. Duckworth. Moreover, Ms. Duckworth never sought child support from Mr. Stanton, based on her initial understanding with appellee. She claimed that she has no intention of doing so at this juncture, because of the emotional ramifications for Julie. In addition, she testified that soon after Julie was born, Stanton "signed papers and was willing to give [Julie] up for adoption[,]" so that appellee could adopt Julie. Therefore, it does not appear that Mr. Stanton is a financial resource for child support. If appellee's obligation is terminated, there would be a large financial void, adverse to the interests of Julie and Ms. Duckworth.

Our conclusion is consistent with cases in other jurisdictions addressing similar situations.

In *Arvizu v. Fernandez*, 183 Ariz. 224, 902 P.2d 830 (App. 1995), the Court of Appeals of Arizona considered whether Armando Arvizu could challenge the paternity of his son twenty years after his divorce from the child's mother. The mother "brought contempt proceedings against appellee Armando C. Arvizu ("father") for failure to pay child support arrearages ordered pursuant to a 1971 divorce decree." *Id.* at 831. The father argued that one of the children, Armando, Jr., was not his, and that this challenge was not barred "because, at the time of the divorce decree, he was not aware of the possibility" that Armando, Jr. was not his son. *Id.* at 833. The appellate court held that laches barred him from challenging paternity, explaining, *id.* at 834

Although we do not know precisely when father first became "suspicious," he acknowledges that he became "convinced" by 1981 that Armando, Jr. was not his. Yet, despite such knowledge, father later that year stipulated to an increase in his child support obligation and did not bring to the court's attention his claim challenging paternity.

Four years later, mother initiated another post-judgment proceeding against father. Although he claims to have discussed the issue of paternity with an attorney at that time, father did not contest mother's petition and thereby allowed both an increase in his child support obligation and a judgment for arrearages to be ordered by the court.

It was not until 1993, twelve years after he admittedly became "convinced" that Armando, Jr. was not his son, that father attempted to challenge paternity. Under these circumstances, where father has waited at least twelve years and has neglected several opportunities to bring his claim to the court's attention, we hold that his delay was unreasonable.

Furthermore, the court held that the resulting prejudice to the mother was "obvious." *Id.* The court reasoned: "Had father timely asserted his claim, and had blood tests revealed that Armando, Jr. was not his son, mother could have sought support payments from the biological father. But because Armando, Jr. has now been emancipated for more than seven years, mother cannot seek support from someone other than father." *Id.* (Citations omitted). *See also Social Services of Ulster Cty., ex rel. Montgomery v. Powell*, 39 A.D.3d 946, 833 N.Y.S.2d 285 (2007) (holding that trial court, in considering father's 2004 motion to vacate 1986 order of paternity and 2001 child support order, did not abuse its discretion in concluding that laches barred father's motion).

■ We are also satisfied that the doctrine of judicial estoppel barred any attempt by appellee to terminate support for Julie. In *Eagan v. Calhoun*, 347 Md. 72, 87–88, 698 A.2d 1097 (1997), the Court of Appeals explained:

Maryland has long recognized the doctrine of estoppel by admission, derived from the rule laid down by the English Court of Exchequer in *Cave v. Mills*, 7 H. & W. 927 that "[a] man shall not be allowed to blow hot and cold, to claim at one time and deny at another."

As the Court explained in *Dashiell v. Meeks*, 396 Md. 149, 171, 913 A.2d 10 (2006), there are three elements to judicial estoppel:

(1) one of the parties takes a factual position that is inconsistent with a position it took in previous litigation, (2) the previous inconsistent position was accepted by a court, and (3) the party who is maintaining the inconsistent positions must have intentionally misled the court in order to gain an unfair advantage.

On at least two separate occasions, appellee admitted to the court that he is Julie's father. First, he filed a Divorce Complaint in 1999, in which he knowingly asserted that he is the father of all four children born during the marriage to Duckworth. In 2002, appellee sought custody of Julie, and he signed an agreement stating that Julie was "born as issue" of his marriage to Ms. Duckworth. Moreover, the divorce court clearly accepted these assertions. Yet, in his sworn Request for Paternity Determination appellee asserted the inconsistent position that Julie "is not his biological daughter" in order to gain an economic benefit: termination of his child support obligation.

Accordingly, we shall vacate the order terminating appellee's child support obligation and remand for further proceedings.

**ORDERS OF JANUARY 19, 2007 OF THE CIRCUIT COURT FOR GARRETT COUNTY VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**